SAM D. JOHNSON, Circuit Judge:
This case arises from a petition for reclamation filed in a Chapter XI bankruptcy proceeding by Woods-Tucker Leasing Corporation of Georgia (Woods-Tucker). Hutcheson-Ingram Development Company (Hutcheson-Ingram), the debtor and a Texas partnership engaged in real estate development and citrus farming, approached Woods-Tucker for a $75,000 loan to complete an apartment project in Brownsville, Texas. Woods-Tucker, a foreign corporation licensed to do business in Texas, responded by asking for collateral. Hutcheson-Ingram offered a variety of equipment it used in its citrus farming. Woods-Tucker then set up a sale-leaseback transaction in which, according to the documents, it bought the farm equipment from Hutcheson-Ingram for $85,000 and then leased it back to Hutcheson-Ingram. Significantly, the lease stipulated that it was to be governed by Mississippi law. Hutcheson-Ingram defaulted on the lease and eventually filed for rehabilitation under Chapter XI. Woods-Tucker then attempted to obtain the farm equipment by filing a petition for reclamation in the bankruptcy court. Hutcheson-Ingram and its receiver, Harry L. Crumpacker, III, opposed the reclamation, asserting that the sale-leaseback transaction was a usurious loan secured by the equipment.
At the outset, we must decide which state’s law, Mississippi or Texas, governs this case. Applying that law, we must then decide what evidence is admissible to show whether the transaction between Woods-Tucker and Hutcheson-Ingram was a genuine sale-leaseback or a usurious loan. Based on the evidence that we determine to be admissible, we must next determine the nature of the transaction, and finally, if we *404 decide the transaction was a usurious loan, we must apply the usury penalties of the state whose law we have determined governs.
I. The Facts
At the time of the events giving rise to this case, Hutcheson-Ingram was in the business of farming in the Rio Grande Valley and developing real estate in Texas. A Woods-Tucker letter that is in the record indicates that Woods-Tucker was in the business of “finance, leasing, sale and leaseback, and industrial financing.” Woods-Tucker was a wholly owned subsidiary of First National Holding Corporation, a concern based in Atlanta, Georgia. Woods-Tucker was licensed to do business in Texas, and had four Texas offices, in Austin, Dallas, Houston, and San Antonio. Its employees in Texas included a vice president, a credit manager with the authority of a corporate treasurer, and thirteen salesmen spread through the various offices. Ray Howell, the salesman with whom Hutcheson-Ingram dealt, worked out of the Albuquerque, New Mexico office of Woods-Tucker. Tom Ohland, the Dallas based vice president of Woods-Tucker, was Howell’s immediate supervisor.
This case began in the summer of 1974 when, according to the testimony of Hutcheson-Ingram’s general partner, Skip Hutcheson, interest rates were very high and money was almost impossible to obtain. Hutcheson approached Ray Howell and said that he needed to borrow $75,000 to complete an apartment project in Brownsville, Texas.[1] Howell replied, “I believe we can work something out,” and he asked what Hutcheson had for collateral. Hutcheson said that he had some farm equipment in the Valley. When Howell got back to Hutcheson after their initial contact, he said that he could get Hutcheson the money and that the transaction would be structured as a sale-leaseback.
On July 20, 1974 Hutcheson-Ingram executed two documents that Woods-Tucker providéd to effectuate the sale-leaseback. The first of these documents was a bill of sale under which Hutcheson-Ingram transferred various farm equipment to Woods-Tucker in exchange for $85,000. This farm equipment, all of which was used in the Hutcheson-Ingram citrus farming operation in the Valley, included: five tractors, two tank trucks, several sprayers, and 2,750 orchard heaters. The second document executed by Hutcheson-Ingram was a lease application and original copy of a lease. The lease provided that Woods-Tucker would lease the equipment described in the bill of sale to Hutcheson-Ingram for $3,017.50 per month for three years. The lease called for a security deposit of $8,500, and Hutcheson-Ingram made out a check to Woods-Tucker for that amount. The lease was on a preprinted form, with the notation, “Copyright 1967 by Woods-Tucker Leasing Corporation.” Testimony at trial indicated that Woods-Tucker offered this standard preprinted form to its clients on a take it or leave it basis. The lease provided that the lessee would bear the entire risk of loss, theft, destruction, or damage to the leased equipment from any cause whatsoever. It obligated the lessee to maintain insurance on the leased equipment payable to the lessor. It also provided that the leased equipment “is, and shall at all times remain, the property of the Lessor; and Lessee shall have no right, title, or interest therein or thereto except as expressly set forth in this lease.” The final provision of the lease, the last sentence in the twenty-fifth and last paragraph on the reverse side of the lease, stated that, “This lease shall be governed by the law of the state of Mississippi.”
Two days after Hutcheson-Ingram executed the bill of sale and original lease, John Killian, the Austin based credit manager of Woods-Tucker, sent the signed and completed lease application to the Woods-Tucker home office in Hattiesburg, Mississippi, with the recommendation that the office accept the lease. Part of Killian’s recommendation included an estimate of $197,000 for the value of the farm equip *405 ment. Killian based this estimate on his personal inspection of the equipment. The recommendation referred to the equipment as collateral. Woods-Tucker apparently accepted the lease and executed the original shortly after receiving it at their home office in Mississippi. At the same time, Woods-Tucker sent a check for $85,000 to Hutcheson-Ingram. Woods-Tucker filed financing statements in Mississippi and in Texas covering the equipment.
II. Proceedings in the Bankruptcy and District Courts
Hutcheson-Ingram made eleven monthly payments under the lease and then refused to make further payments. Woods-Tucker sued in the Texas state courts to recover the past due lease payments. HutchesonIngram filed for rehabilitation under Chapter XI on July 6, 1976. This, of course, stayed the state court proceeding. Woods-Tucker then petitioned the bankruptcy court for reclamation of the farm equipment. Hutcheson-Ingram and its receiver counterclaimed, alleging that the transaction with Woods-Tucker was not a sale-leaseback but a usurious secured loan. At the time Hutcheson-Ingram filed this Chapter XI petition, some of the farm equipment had been liquidated in the state court proceedings, and the registry of the court contained $16,000 from the sale of the farm equipment. The parties stipulated that whoever prevailed on the petition for reclamation in the bankruptcy court would be entitled to that $16,000. The remainder of the farm equipment that had not been liquidated in connection with the state court proceeding was sold at public auction by the bankruptcy receiver for $27,200. Thus, if Woods- Tucker prevails in this action, it will receive $16,000 plus $27,200 less costs of the receiver’s sale.
The bankruptcy court first held that Hutcheson-Ingram could introduce parol evidence that Woods-Tucker had granted it an oral option to repurchase the equipment at the end of the lease term. The court then went on to hold that the sale-leaseback transaction was a secured loan and a contrivance to evade the usury laws of Texas. Applying Texas conflicts rules, the bankruptcy court refused to give effect to the Mississippi choice of law provision in the “lease.” The court held the loan violated Texas Civil Statutes Ann. Article 5069-1.02 (1971) and that Woods-Tucker was subject to penalties under Article 5069-1.06 (1971) for exacting more than twice the lawful rate of interest of ten percent. It then entered judgment awarding Hutcheson-Ingram the following relief:[2] $75,000, twice the amount of usurious interest contracted for; $35,000, the principal paid by Hutcheson-Ingram to Woods-Tucker; $8,500, the security deposit; $81,500 for attorney’s fees; and cancellation of the debt. The bankruptcy court also decreed that Hutcheson-Ingram could recover the $16,000 in the state court registry and the net proceeds from the bankruptcy receiver’s sale of the remaining farm equipment.
Woods-Tucker appealed to the district court. Organizing its opinion in a manner that we shall follow, the district court first determined what law applies to the case. The court held that the bankruptcy court was clearly erroneous in finding that the transaction between Hutcheson-Ingram and Woods-Tucker was a contrivance to evade Texas usury law. Applying Texas choice of law rules, the district court gave effect to the choice of law provision in the lease and held that Mississippi usury law governs the case. Mississippi law, the district court concluded, sweeps away parol evidence and statute of frauds objections to evidence extrinsic to a written agreement when that extrinsic evidence shows that the substance of a transaction is a usurious loan. Based in part on extrinsic evidence, the district court concluded that the sale-leaseback transaction was in fact a usurious loan. The district court then applied the Mississippi usury penalties and held that Hutcheson-Ingram was entitled to: cancellation of all indebtedness to Woods-Tucker; return of the $35,000 paid to Woods-Tucker; return of the $8,500 security deposit; the *406 $27,200 held by the receiver from the sale of some of the farm equipment; and the $16,-000 held in the registry of the state court. The district court also vacated and remanded for further consideration under Mississippi law the district court’s award of attorney’s fees. The district court, however, noted that the bankruptcy court’s award of attorney’s fees was not clearly erroneous. It vacated the award of the bankruptcy court because that award was based in part on Hutcheson-Ingram’s recovery in the bankruptcy court, which its judgment reduced.
Woods-Tucker appealed to this court, asserting for a variety of reasons that the bankruptcy court and the district court erred in determining that the sale-leaseback was a loan. Woods-Tucker does not argue that if the transaction was a loan, the loan was not usurious. Nor does Woods-Tucker argue that either the bankruptcy court or the district court improperly awarded damages under Texas or Mississippi law. Hutcheson-Ingram has cross-appealed from the judgment of the district court. It asserts the district court erred in determining that Mississippi usury law governs the transaction under Texas choice of law rules.
III. Choice of Law
The first issue to be decided is what choice of law rule to apply. The obvious choices are the choice of law rule of the state in which the bankruptcy court sat, Texas or a federal choice of law rule. According to Professor Moore, “In federal matters, where conflicts of law questions arise for determination, a federal court is not bound by the forum state’s conflicts rules and can apply whatever law in its independent judgment it deems applicable to the controversy.” 1A Moore’s Federal Practice ¶ 0.325 (1979). The Supreme Court left this question open in McKenzie v. Irving Trust Co., 323 U.S. 365, 371, n.2, 65 S.Ct. 405, 408, n.2, 89 L.Ed. 305 (1945). One year later, however, in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161-162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946), the Court intimated that a bankruptcy court should look to the conflicts law of the state with the most significant contacts to the transaction in issue when federal law does not clearly govern.
The instant case involves a usury claim by a Texas debtor. No federal law clearly governs. We hold that the bankruptcy court properly applied Texas choice of law rules to determine whether Texas usury law or Mississippi usury law governs this case. Texas has the most significant contacts with the transaction in issue here. The transaction involved a Texas borrower for whose protection the Texas usury laws were enacted (the Mississippi usury laws were not enacted to protect Texas borrowers). Applying Texas choice of law rules, which like Texas usury law, have been interpreted to protect Texas borrowers is consistent with the federal bankruptcy policy of affording relief to debtors. Finally, Texas choice of law rules will produce a determination of the rights and liabilities of the parties to the transaction in issue here uniform with the other forums in which those rights and liabilities could be adjudicated. Those forums are, in all likelihood, the Texas state courts or the Texas federal courts sitting in diversity.[3]
The Texas choice of law cases establish a strong policy of protecting Texas debtors. There is occasional language in the cases that could lead to a contrary result, but the facts of the cases reinforce the policy of protecting Texas debtors. In Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891), the court stated the general rule that the citizens of two different states contracting to make a loan could agree to an interest rate lawful under either state’s usury law. The *407 borrower in Dugan was a Texas citizen who took out a $5,000 note from an English mortgage company through his New York agent. The note was payable in New York; it was secured by a deed of trust on Texas land; and it provided that its validity was to be governed by Texas law. The court upheld the validity of the note under the general rule quoted above.
The court also noted that there was an exception to the general rule, which did not happen to apply in the case before it.
It must be kept in view that usury laws cannot be evaded under cover of naming a state whose laws shall control the contract.
It is difficult, however, to conceive how that result can ever proceed from the state of the actual residence of the debtor being named.
79 Tex. at 253, 14 S.W. at 1026. Dugan thus establishes that a contractual stipulation that the usury laws of the borrower’s state shall control cannot be an evasion giving rise to an exception to the general rule stated above.
Six years after Dugan, in Building & Loan Association of Dakota v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897), the Texas Supreme Court interpreted the exception established in Dugan to protect Texas borrowers from contractual manipulations that would otherwise have robbed the borrowers from the protection of their own usury laws. In Griffin, the lender had been organized in Dakota, but it had a permit to do business in Texas. The borrower lived in Texas, all his property was in Texas and the deed of trust securing the loan was on Texas property. The loan, however, called for payments to be made in Dakota. The lender argued that Dakota usury law controlled the case because Dakota was the place of performance for the loan.
The court acknowledged the general rule, “that a contract which is to be performed in a state other than that in which it is made may reserve interest according to the laws of either state.” The court stressed the exception to the general rule i.e., Texas does not tolerate contrivances intended to evade its usury laws. The court then went on to hold that the contract, “In so far as it provide[s] . . . for . . . payment . in . . . Dakota [is] a device to evade the laws of this state” as a matter of law. 90 Tex. at 488, 39 S.W. at 659.
The court in Griffin reached its result be applying a policy of borrower protection. In quoting a decision of the North Carolina Supreme Court, it recognized the fact that foreign lenders could easily evade the Texas usury laws if it upheld the validity of choice of law provisions in loans naming a state other then the borrower’s. “[A]ll lenders . could express in [their loans] that payment is to be made at some place in a country where no usury laws exist, reserving a rate of interest, by which device all the business of the state could be done upon the same plan as in this case, in defiance of our law.”[4] 90 Tex. at 491, 39 S.W. at 660. The Court concluded its analysis in Griffin with a comparison of the interests of Dakota and Texas in having the contract interpreted under their laws. The contract was not made with the intention that it should be enforced or performed in Dakota so, the Court held, there was no conflict between the laws of Dakota and Texas. Finally, the Court concluded that to not apply the Texas usury laws to the contract would annul the Texas usury statutes. Cf. Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979) (rejecting the conflicts rule of lex loci in torts and adopting a flexible rule of applying the . law with the most significant relation to the tort).[5]
Recent cases from courts of civil appeals in Texas have adopted both the language *408 and the principles of Griffin. The borrower in Securities Investment Co. v. Finance Acceptance Corp., 474 S.W.2d 261 (Tex.Civ. App.—Houston [1st Dist.] 1971, writ ref’d n.r.e.), was a Texas consumer finance company that sued the Missouri company from which it borrowed its operating capital. The loan agreement between the parties provided that it was to be governed by Missouri usury law, which does not allow a corporation to assert a usury defense. The court upheld this choice of law provision, noting that the borrower had not pled that the agreement was a subterfuge or a device to evade Texas law and had not developed any evidence of a subterfuge or contrivance. The court stressed the fact that the lender had an office in Missouri, had no office in Texas, and that the collateral securing the loan was forwarded to the lender in Missouri. In contrast, Texas property secured the loan in Griffin and the lender in Griffin was licensed to do business in Texas.
Similarly, in the instant case, the lender had offices in Texas, and the collateral securing the loan was in Texas. The borrower in the instant case pled and proved that the sale-leaseback transaction was a device to evade the usury laws of Texas. The bankruptcy court expressly so found and we affirm that finding as not being clearly erroneous on two grounds. First, the fact that the parties in this case styled their transaction as a sale-leaseback instead of a secured loan supports a finding of a device or contrivance to evade the Texas usury laws. Second, the provision in the agreement in this case that the laws of Mississippi shall apply is a device to evade the Texas usury laws just as the provision that payments on the loan in Griffin be made in Dakota was conclusive evidence of a device to evade the Texas usury laws. As stated in Griffin, the state of the foreign lender has no real interest in applying its usury laws to a Texas debtor,[6] and any attempt by the foreign lender to manipulate the contract terms so that the laws of a state with no interest in the contract will apply is a device to evade the Texas usury laws.
The cases discussed above indicate that Texas applies its choice of law rules so that the Texas laws protect Texas borrowers. In High Fashion Wigs Profits Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App.—Eastland 1979, no writ hist.), the court applied Texas choice of law rules so that the Oklahoma usury laws would protect an Oklahoma borrower. There, a New Jersey lender agreed to supply construction financing to two Oklahoma borrowers for the construction of an office building and apartment in Lubbock, Texas. The agreements between the borrowers and the lender were negotiated in Oklahoma and New Jersey. The loans provided that they were to be governed by Oklahoma law, or alternatively New Jersey law. While the opinion does not indicate whether these choice of law provisions were negotiated, they were apparently drafted for the single loan between the borrower and the lender. In contrast, the choice of law provision in the instant case was buried at the bottom of the back page of a preprinted form offered to the borrower on a take it or leave it basis. In High Fashion Wigs, the lender made its disbursements in Oklahoma and mailed its interest statements to Oklahoma. The trial court found *409 that the agreement was free of any taint of sham, subterfuge, or coercion and that Oklahoma bore a reasonable relation to the parties and their transactions. Holding that probative evidence supported the trial court’s finding, the court of appeals affirmed. Going back to the interest analysis first set out in Dugan and Griffin, this case simply illustrates an application of Texas choice of law rules to apply the usury laws of the borrower’s state.
Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979) sanctions the emphasis this Court places on interest analysis in choice of law. In that case, the Texas Supreme Court rejected the lex loci conflicts rule in torts in favor if a conflicts rule applying the law of the state with the most significant relation to the tort. The reasons the court gave for abandoning lex loci apply with equal force to any conflicts rule contrary to the one we use here. Those reasons were that lex loci ignores the very substantial interest of the forum state, that lex loci led to judicial maneuvering, and that the ease of administration is an inadequate reason to retain an unjust rule. 583 S.W.2d at 317. We interpret the cases as establishing a rule that notwithstanding a contrary provision in an agreement, Texas will apply the usury laws of the borrower’s state. There is an exception to this rule when the agreement names the law of a state other than the borrower’s as controlling and the borrower fails to plead and prove that state has no interest in the transaction. The mere fact that a lender resides in a state does not give that state an interest in applying its usury-laws to the borrowers of another state. Furthermore, any contacts with the foreign state that the lender can manipulate in its favor by agreement, such as the requirement that payments be made in the foreign state or the loan be accepted there, do not create contacts sufficient to involve the interest of the foreign state. See, Comment, Usury and the Conflict of Laws: The Doctrine of Lex Debitoris, 55 Calif.L.Rev. at 183-188.
 The argument remains that the rule just enunciated will interfere with the expectation of the parties who enter into a loan agreement that stipulates the law of a state other than the borrower’s will apply. In the usury field, the expectations of the parties really mean very little. In a case in which a particular state’s usury law clearly governs a loan, the lender should not be heard to argue to a court that its extraction of an usurious rate of interest should stand to justify the expectation of the parties. Similarly, when a lender uses its bargaining power to extract a choice of law provision in addition to an excessive rate of interest, the lender cannot argue successfully that the court must enforce that choice of law provision to justify the expectation of the parties. The expectation of the parties can be little more than a self-fulfilling prophecy. If the courts take the position that choice of law provisions are worth very little in usury cases, neither the lender nor the borrower can expect them to be enforced. The necessitous borrower, for whose benefit the usury laws were enacted, expects to obtain a sum of money in exchange for assuming a future obligation. This expectation predominates to the point of extinguishing any other expectation. Frequently, as in this case, the borrower may not even read the agreement he signs, and his expectations cannot include the honoring by a court of some provision in fine print on the back of a contract.
Finally, we must address the argument that this decision will interfere with commerce and make loans less available to would be Texas borrowers. The interest rate on the loan in this case was 20.46 percent, just over twice the allowable rate under the Texas usury laws. This Court recognizes that in the time between the loan in the instant case was made and this decision was written, the prime rate that national banks charge their best customers has reached twenty percent. The Wall Street Journal, April 4, 1980, at 5, Col. 4. Yet, Woods-Tucker is subject to substantial penalties under Texas law for charging 20.-46 percent to the borrower in this case. The argument that this decision will make loans less available to Texas borrowers is an *410 argument to the Texas Legislature to amend its usury laws. Cf. The Wall Street Journal, March 28, 1980, at 2, Col. 3 (“Financial-services companies, complaining that state usury laws keep them from passing along the high cost of money are moving to curtail their consumer-loan obligations.”). It is not an argument for this Court or any other court to engage in the judicial maneuvering referred to in Gutierrez. Here, that maneuvering would take the form of twisting the Texas choice of law rules in usury cases to give effect to contractual choice of law provisions naming as controlling the law of a state with no interest in the agreement. Such a twisting would have four untoward effects. First, it would place the Court in an improper role. Second, it would lessen the demand for reform of the usury laws. (We do not intimate that this demand is legitimate, only that the courts should not interfere with whatever demand there is.) Third, it would give an unfair advantage over domestic lenders to foreign lenders who set up shop in Texas. Fourth, the damage done by twisting the choice of law rules now might be difficult to undo, leaving Texas borrowers without protection even if the usury laws were amended.[7]
IV. Extrinsic Evidence to Show the True Nature of the Transaction
Having determined that Texas usury law governs this case, we must now determine whether evidence extrinsic to the documents in this case is admissible to show that the transaction evidenced by the documents was a secured loan rather than a sale-leaseback.[8] Transamerican Leasing Co. v. Three Bears, Inc., 586 S.W.2d 472 (Tex.1979) requires Hutcheson-Ingram to show that its lease agreement with Woods-Tucker included a purchase option in order for it to show that it was a victim of a usurious loan. The trial court in Transamerican Leasing excluded evidence that tended to show that the parties to a written lease of restaurant equipment had an oral agreement giving the lessee an option to purchase the leased equipment at the end of the lease term. The Supreme Court affirmed the trial court. Reasoning that the lease had an integration clause[9] so that the claimed oral purchase option was inconsistent with the lease, not merely collateral to it, the court held that the parol evidence rule applied. See also Hobbs Trailers v. J. T. Arnett Grain Co., 560 S.W.2d 85, 87 (Tex.1977) (excluding evidence of an oral purchase option to a lease agreement that included an integration clause and a statement that, “This transaction is a leasing and not a sale, conditional or otherwise.”)
The lease between Hutcheson-Ingram and Woods-Tucker did not include an integration clause. The admission of testimony concerning the oral option did not violate the parol evidence rule because the oral option was collateral to, not inconsistent with, the lease agreement. There is noth *411 ing inconsistent between an agreement for a lease of property for a particular period of time and another agreement for the sale of that property at the end of that time. The inconsistency only arises when the lease agreement provides that it is the entire agreement between the parties regarding the subject property. The bankruptcy court therefore did not err in admitting the testimony of Skip Hutcheson that Ray Howell, the salesman for Woods-Tucker, had given him an oral option to purchase, at the end of the lease term, the farm equipment sold to and then leased from Woods-Tucker. Hutcheson testified that the price of this option was simply forfeiture of the $8,500 security deposit already paid by HutchesonIngram.
Woods-Tucker asserts that Howell had no authority to grant an oral purchase option and that Howell could not establish authority solely by his own statements. Here, Howell’s authority to grant a purchase option was apparent. He was a Woods-Tucker representative authorized to negotiate leases. Furthermore, there was testimony at trial that it was standard procedure for Woods-Tucker to grant oral purchase options. In fact, the trial testimony indicated that if a lessee requested a written purchase option, Woods-Tucker would attempt to dissuade him by saying the Internal Revenue Service would view the lease as a loan if the purchase option were put in writing.
Hutcheson-Ingram also contends the bankruptcy court erred in allowing testimony regarding the oral purchase option into evidence because that testimony violated the statute of frauds. Woods-Tucker asserts that two separate statute of frauds provisions apply in this case. First, U.C.C. § 2-201(1), Tex. Bus. & Com. Code Ann. § 2.201(a) (1968), which provides that
Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought .
This provision does not require the exclusion of testimony that there was an oral purchase option. Hutcheson-Ingram is not seeking to enforce its oral purchase option. It seeks only to show that an option existed to shed light on the true nature of its agreement with Woods-Tucker. Furthermore, U.C.C. § 2-201(1) is expressly subject to U.C.C. § 2-201(3)(c). The statute of frauds does not apply “with respect to goods for which payment has been made.” Hebe, the option price was $8,500, which Hutcheson-Ingram paid to Woods-Tucker at the beginning of the lease term. Hutcheson-Ingram’s performance of its obligations under the oral purchase option took the option out of the statute of frauds.
The other arguably applicable statute of frauds provision is Texas Business and Commerce Code Annotated § 26.01(b)(6) (1978), which provides that, “An agreement which is not performed within one year from the date of making” is not enforceable unless it is in writing. Again, HutchesonIngram does not seek to enforce its oral purchase option. Hutcheson-Ingram’s payment of the option price within one year from the granting of the option takes the option out of the statute of frauds. See Wynnewood State Bank v. Brigham, 434 S.W.2d 874 (Tex.Civ.App.—Texarkana 1968, writ ref’d n. r. e.); 2 Corbin on Contracts § 457 (1950).
Thus, the bankruptcy court did not err in admitting evidence that Woods-Tucker granted Hutcheson-Ingram an oral option to purchase at the end of the lease period. Evidence tending to show that the lease in this case was part of a lease-purchase agreement allows Hutcheson-Ingram, under Transamerican Leasing, to show that the lease was in fact a loan.
V. Secured Loan or Sale-Leaseback?
The bankruptcy court and the district court both concluded that the sale-leaseback transaction between HutchesonIngram and Woods-Tucker was a secured loan subject to the usury laws. We reject Woods-Tucker’s argument that the lower *412 courts erred in their conclusion. U.C.C. § 1-201(37), Tex.Bus. & Com.Code Ann. § 1.201(37) (1978) defines the test for deciding whether a lease is really a secured loan for the purpose of determining the applicability of Article 9 of the U.C.C. That section provides that
Whether a lease is intended as security [for a loan] is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended Jor security and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.
In Davis Brothers v. Misco Leasing, Inc., 508 S.W.2d 908, 76 A.L.R.3d 1 (Tex.Civ.App.—Amarillo 1974, no writ hist.), the court interpreted U.C.C. § 1-201(37) to require first an inquiry into whether there is a purchase option and whether the option price is nominal or substantial. If there is an option and the option price is nominal in relation to the fair market value of the equipment subject to it, then the lease is, conclusively, a secured loan.[10] If the option is not nominal the court must look to all the facts surrounding the transaction to determine whether there is a lease or a loan.
A very recent decision from a Texas court of civil appeals adopts the Davis Brothers test of determining whether the option in the lease is nominal for the purpose of deciding whether the lease is a loan subject to the usury statutes. Brokers Leasing Corp. v. Standard Pipeline Coating Co., 602 S.W.2d 278 (Tex.Civ.App.—Dallas, No. 20150, April 14, 1980), noted in 17 Texas Lawyers Weekly Digest No. 26 (1980). There, the court found that a transaction styled as a lease was, in fact, a lease rather than a loan. The court relied on the fact that the option price of $2,235 was by the terms of the contract considered the fair market value of the property subject to the lease, and that testimony at trial indicated that the equipment would be worth $6,900 at the end of the lease term. Similarly, in Southwest Park Outpatient Surgery, Ltd. v. Chandler Leasing Division, Pepsico Leasing Corp., 572 S.W.2d 53 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ hist.), the court, held that a lease was not a conditional load subject to the usury laws because the optión price under the lease was the fair market value of the property subject to the lease. The court in Security Life Insurance Co. v. Executive Car Leasing Co., 433 S.W.2d 915 (Tex.Civ.App.—Texarkana, writ ref’d n. r. e.), relied on the fact that the agreement between the parties did not include any purchase option in holding that the agreement was not subject to the usury laws. The court also looked to the surrounding circumstances, including the fact that the parties approached each other seeking to execute a lease, not a loan.
Given the nominal option test of Brokers Leasing and the reliance that the court in Security Life Insurance Co. placed on facts surrounding the transaction, we think that U.C.C. § 1-201(37) sets forth the proper test for determining whether a transaction styled as a lease is a loan for the purpose of the usury statutes.
In the instant case, Hutcheson-Ingram failed to introduce any direct evidence of the fair market value of the farm equipment at the end of the lease period. The bankruptcy court noted that the leased property had been liquidated for over $40,-000 in forced liquidation sales. Had the bankruptcy court chosen to rely on this fact for a finding that $8,500 was a nominal consideration to pay for the equipment, that would have ended the matter. The court, however, chose not to make such a finding. Instead, it applied the general rule of U.C.C. § 1-201(37) that a consideration of all relevant facts determines whether the transaction was, in fact, a loan rather than a lease.
*413 The parol evidence rule under Texas law does not prevent an examination of the facts surrounding the transaction in this case for the purpose of determining whether that transaction was a loan subject to the usury laws. As the district court noted, quoting from Corbin,
A bargain for a loan can easily be disguised in other forms to which the usury laws appear not to be applicable. As in the case of all other illegal bargains, the court will penetrate the disguise if it can and make the provisions of the usury statute effective . . . parole testimony in all relevant circumstances are admissible in evidence.
6 Corbin on Contracts § 1501 (1951). The Transamerican Leasing and Hobbs Trailer cases discussed above must be seen as an exception to this rule. The exception applies only to parol evidence of prior agreements inconsistent with the written agreement of the parties. It does not apply to collateral agreements or to evidence of surrounding circumstances. For example, in Wilbanks v. Wilbanks, 160 Tex. 317, 330 S.W.2d 607, 608 (1960), the court stated that “a deed absolute on its face may be shown by parol evidence to have been intended as a mortgage given to secure a debt owing to the grantee by the grantor.” In Gonzales County Savings & Loan Association v. Freeman, 534 S.W.2d 903 (Tex.1976), the court remanded the case for an examination of extrinsic evidence to determine whether a charge in a note labeled as a “loan fee” was usurious interest rather than a legitimate loan commitment fee. See also Stedman v. Georgetown Savings and Loan Association, 595 S.W.2d 486 (Tex.1979).
The bankruptcy court properly concluded that based on the facts in this case Hutcheson-Ingram’s sale and leaseback of the equipment was a loan. Among those facts are the following:
1. The substantial difference between the market value of the subject property and its “sale” price. Here, Woods-Tucker “bought” property it valued at $197,000 for $85,000. Compare Napper v. Johnson, 464 S.W.2d 496 (Tex.Civ.App.—Waco 1971, writ ref’d n. r. e.) (property worth between $50,-000 and $60,000 “sold” for $14,950 in a mortgage transaction) with Rinyu v. Teal, 593 S.W.2d 759 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ hist.) (payment of $4,750 for cloudy title to fifteen acres of land and for the seller’s almost “non-existent equity” in 77.8 acres that were posted for foreclosure the day after the sale indicates a sale rather than a loan).
2. The amount of “rent” paid was based on the amount of the advance by the “lessor” rather than the value of the property. See Comment, Real Estate Sale-Leaseback Agreements Under Texas Usury Law: Circumvention or Sale?, 7 St. Mary’s L.J. 821 (1976). In the instant case, Woods-Tucker valued the farm equipment subject to the lease at $197,000, but it determined the rental it charged for that equipment by applying an add on interest rate to the amount it advanced to Hutcheson-Ingram.
3. Hutcheson-Ingram approached Woods-Tucker seeking to borrow money, not to sell its equipment. Woods-Tucker responded by asking what collateral Hutcheson-Ingram had and then saying that the transaction would have to be “structured” as a sale-leaseback. See generally Security Life Insurance Co., 433 S.W.2d at 917.
4. Woods-Tucker maintained no inventory of equipment that it “leased” to parties like Hutcheson-Ingram. From this fact it can be inferred that the lessees retained the leased property at the termination of their leases. See Davis Brothers v. Misco Leasing.
5. The “lease” required Hutcheson-Ingram to pay all taxes, insurance, and expenses for repairs of the subject property. Id.[11]
*414 Woods-Tucker argues strenuously that the transaction in issue here was a lease because both parties to the lease treated it as such for federal income tax purposes. Woods-Tucker even goes so far to accuse Hutcheson-Ingram of fraud in taking a position on its federal income tax returns that the transaction in issue here was a lease and a position before this Court that the transaction was a loan. The meaning of every word varies with its context. The transaction between Hutcheson-Ingram and Woods-Tucker could be a true lease for federal tax purposes and a loan for state usury law purposes. Each of these substantive areas of law will define and distinguish between loans and leases based their underlying purposes and policies. Tax law and usury law purposes and policies differ. Therefore, they define loans and leases differently. The treatment of a transaction for federal tax purposes has little relevance to whether that transaction is a loan or a lease within the meaning of state usury law.
VI. Conclusion
The first issue in this case was whether the application of a federal choice of law rule or a state choice of law rule was proper in bankruptcy. It was determined that the bankruptcy court properly applied Texas choice of law rules as the policies embodied in Texas choice of law rules that protect Texas borrowers are consistent with the general policy of the Bankruptcy Act to provide relief to debtors. It was next decided that the Texas courts would hold that the provision in the lease designating Mississippi law as controlling was a contrivance to evade the Texas usury laws. The provision was a contrivance because it named as governing the laws of a state with no interest in having its usury laws applied to the transaction in issue. This contrivance voided the choice of law provision and required the application of Texas usury law. Texas law allows proof of the oral option to purchase because the lease agreement did not contain an integration clause. Finally, looking to the surrounding facts and circumstances under Texas law, the sale-leaseback transaction was, in fact, a secured loan subject to the Texas usury laws.
Woods-Tucker has not asserted that the bankruptcy court misapplied the Texas usury laws if those laws govern and the transaction was a loan rather than a lease. This applies to the bankruptcy’s court award of attorney’s fees as well. The district court has already decided that the bankruptcy court’s award of attorney’s fees was proper if Texas law controls. Accordingly, the bankruptcy court judgment must stand. We vacate the judgment of the district court and remand for entry of judgment affirming the bankruptcy court.
VACATED AND REMANDED.

. The record does not reflect where Hutcheson approached Howell.

. These figures have been rounded off.

. Twenty-five years ago this Court faced issues similar to those with which we grapple here in Fahs v. Martin, 224 F.2d 387 (5th Cir. 1955). There, the Court determined that the federal rule and the Florida rule on choice of law in usury cases was the same and therefore it did not have to choose between the two. That rule is stated in Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891) and other Texas cases, but as discussed in the text, the Texas courts have developed an exception to the rule that ensures Texas usury law will protect Texas debtors.

. The loan in Griffin did not include a choice of law provision. The Court, however, treated the stipulation in the loan that payments be made in Dakota as the equivalent of a choice of law provision naming Dakota. This analysis is illustrated by the general rule of Griffin referred to in the text and the Court’s reliance on the North Carolina case that overturned a choice of law provision.

. Gutierrez is discussed later in this opinion.

. It is . . clear that the benefit [of a protective law] ... is not intended for all men everywhere, but only for those who by virtue of their relationship to the state are within the legitimate scope of its governmental concern. ... To apply [such laws] . . . for the protection of others, with whose welfare the state has no concern, may in some situations . . . constitute intermeddling so officious and unjustified as to amount to a denial of due process of law or of full faith and credit to the laws of a sister states.
Currie & Schreter, Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities, 69 Yale L.J. 1323, 1324 (1960), quoted in Comment, Usury and the Conflict of Laws: The Doctrine of Lex Debitoris, 55 Calif.L.Rev. 123, at 190, n. 366 (1967). It is also important to note that if a foreign lender comes into Texas and makes loans to Texas borrowers at ruinous interest, that Texas will bear the burden of the lender’s actions. The lender’s state will not. Those burden include relief roles and receivership proceedings swelled by Texas borrowers ruined by high interest.

. High Fashion Wigs stated that U.C.C. § 1-105(1), Tex. Bus. & Com. Code Ann. § 1.105 (a) (1968), codified the law of Dugan v. Lewis. That section provides that, “when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.” This decision holds that under Dugan, Griffin, and their progeny the mere residence of a lender in a foreign state does not make that state bear a reasonable relation to a loan to a borrower in another state.

. In the discussion on the proper choice of law, it was repeatedly assumed that the transaction was a loan and not a sale-leaseback. That assumption was necessary to determine the proper, choice of law rule. Having decided the choice of law issue the Court can now determine the validity of the assumption. There is a problem of circularity here. To determine the correct choice of law it was necessary to assume a loan, and now to determine whether there was a loan it is necessary to apply the choice of law reached assuming that there was a loan. The allegation of usury must be sufficient to require the court to apply the choice of law rules applicable to usury cases. Otherwise, a lender might escape Texas usury laws through the application of non-usury choice of law rules that give undue deference to a contractual choice of law provision.

. The integration clause read: This lease “constitutes the sole agreement of the parties with respect to the subject matter thereof.” 586 S.W.2d at 478.

. The district court applied the Mississippi version of UCC § 1-201(37) which provides that a lease is conclusively a secured loan only if the purchase option requires the lessee to pay no additional, not just nominal consideration.

. The bankruptcy court relied in part on the fact that Woods-Tucker filed financing statements in Mississippi and Texas covering the lease to Hutcheson-Ingram to support its finding that the lease was in fact a secured loan. This reliance was improper in view of U.C.C. § 9-408 which provides that the filing of a financing statement “shall not of itself be a *414 factor in determining whether or not the . . lease is intended as security. (§ 1-201(37)).” The financing statements filed stated that, “This lease is intended as security.” Again, this cannot be considered in determining whether the lease was in fact a loan. See U.C.C. § 9-408 Comment 2 (“This section authorizes filing with appropriate changes of terminology, and without affecting the substantive question of classification of the lease.”)