626 F.2d 401
 30 UCC Rep.Serv. 26
 WOODS-TUCKER LEASING CORPORATION OF GEORGIA,
Plaintiff-Appellant Cross- Appellee,
v.
HUTCHESON-INGRAM DEVELOPMENT COMPANY, a partnership, and
Harry L. Crumpacker, III, Defendants-Appellees
Cross-Appellants.
 No. 79-1651.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1980.
 
 Tate, Circuit Judge, concurred in part and dissented in part and filed opinion.
 J. Albert Kroemer, Dallas, Tex., for plaintiff-appellant cross-appellee.
 Steve Brutsche, Gerald P. Urbach, Dallas, Tex., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, TATE and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 
 1
 This case arises from a petition for reclamation filed in a Chapter XI bankruptcy proceeding by Woods-Tucker Leasing Corporation of Georgia (Woods-Tucker). Hutcheson-Ingram Development Company (Hutcheson-Ingram), the debtor and a Texas partnership engaged in real estate development and citrus farming, approached Woods-Tucker for a $75,000 loan to complete an apartment project in Brownsville, Texas. Woods-Tucker, a foreign corporation licensed to do business in Texas, responded by asking for collateral. Hutcheson-Ingram offered a variety of equipment it used in its citrus farming. Woods-Tucker then set up a sale-leaseback transaction in which, according to the documents, it bought the farm equipment from Hutcheson-Ingram for $85,000 and then leased it back to Hutcheson-Ingram. Significantly, the lease stipulated that it was to be governed by Mississippi law. Hutcheson-Ingram defaulted on the lease and eventually filed for rehabilitation under Chapter XI. Woods-Tucker then attempted to obtain the farm equipment by filing a petition for reclamation in the bankruptcy court. Hutcheson-Ingram and its receiver, Harry L. Crumpacker, III, opposed the reclamation, asserting that the sale-leaseback transaction was a usurious loan secured by the equipment.
 
 
 2
 At the outset, we must decide which state's law, Mississippi or Texas, governs this case. Applying that law, we must then decide what evidence is admissible to show whether the transaction between Woods-Tucker and Hutcheson-Ingram was a genuine sale-leaseback or a usurious loan. Based on the evidence that we determine to be admissible, we must next determine the nature of the transaction, and finally, if we decide the transaction was a usurious loan, we must apply the usury penalties of the state whose law we have determined governs.
 
 I. The Facts
 
 3
 At the time of the events giving rise to this case, Hutcheson-Ingram was in the business of farming in the Rio Grande Valley and developing real estate in Texas. A Woods-Tucker letter that is in the record indicates that Woods-Tucker was in the business of "finance, leasing, sale and lease-back, and industrial financing." Woods-Tucker was a wholly owned subsidiary of First National Holding Corporation, a concern based in Atlanta, Georgia. Woods-Tucker was licensed to do business in Texas, and had four Texas offices, in Austin, Dallas, Houston, and San Antonio. Its employees in Texas included a vice president, a credit manager with the authority of a corporate treasurer, and thirteen salesmen spread through the various offices. Ray Howell, the salesman with whom Hutcheson-Ingram dealt, worked out of the Albuquerque, New Mexico office of Woods-Tucker. Tom Ohland, the Dallas based vice president of Woods-Tucker, was Howell's immediate supervisor.
 
 
 4
 This case began in the summer of 1974 when, according to the testimony of Hutcheson-Ingram's general partner, Skip Hutcheson, interest rates were very high and money was almost impossible to obtain. Hutcheson approached Ray Howell and said that he needed to borrow $75,000 to complete an apartment project in Brownsville, Texas.[1] Howell replied, "I believe we can work something out," and he asked what Hutcheson had for collateral. Hutcheson said that he had some farm equipment in the Valley. When Howell got back to Hutcheson after their initial contact, he said that he could get Hutcheson the money and that the transaction would be structured as a sale-leaseback.
 
 
 5
 On July 20, 1974 Hutcheson-Ingram executed two documents that Woods-Tucker provided to effectuate the sale-leaseback. The first of these documents was a bill of sale under which Hutcheson-Ingram transferred various farm equipment to Woods-Tucker in exchange for $85,000. This farm equipment, all of which was used in the Hutcheson-Ingram citrus farming operation in the Valley, included: five tractors, two tank trucks, several sprayers, and 2,750 orchard heaters. The second document executed by Hutcheson-Ingram was a lease application and original copy of a lease. The lease provided that Woods-Tucker would lease the equipment described in the bill of sale to Hutcheson-Ingram for $3,017.50 per month for three years. The lease called for a security deposit of $8,500, and Hutcheson-Ingram made out a check to Woods-Tucker for that amount. The lease was on a preprinted form, with the notation, "Copyright 1967 by Woods-Tucker Leasing Corporation." Testimony at trial indicated that Woods-Tucker offered this standard preprinted form to its clients on a take it or leave it basis. The lease provided that the lessee would bear the entire risk of loss, theft, destruction, or damage to the leased equipment from any cause whatsoever. It obligated the lessee to maintain insurance on the leased equipment payable to the lessor. It also provided that the leased equipment "is, and shall at all times remain, the property of the Lessor; and Lessee shall have no right, title, or interest therein or thereto except as expressly set forth in this lease." The final provision of the lease, the last sentence in the twenty-fifth and last paragraph on the reverse side of the lease, stated that, "This lease shall be governed by the law of the state of Mississippi."
 
 
 6
 Two days after Hutcheson-Ingram executed the bill of sale and original lease, John Killian, the Austin based credit manager of Woods-Tucker, sent the signed and completed lease application to the Woods-Tucker home office in Hattiesburg, Mississippi, with the recommendation that the office accept the lease. Part of Killian's recommendation included an estimate of $197,000 for the value of the farm equipment. Killian based this estimate on his personal inspection of the equipment. The recommendation referred to the equipment as collateral. Woods-Tucker apparently accepted the lease and executed the original shortly after receiving it at their home office in Mississippi. At the same time, Woods-Tucker sent a check for $85,000 to Hutcheson-Ingram. Woods-Tucker filed financing statements in Mississippi and in Texas covering the equipment.
 
 
 7
 II. Proceedings in the Bankruptcy and District Courts
 
 
 8
 Hutcheson-Ingram made eleven monthly payments under the lease and then refused to make further payments. Woods-Tucker sued in the Texas state courts to recover the past due lease payments. Hutcheson-Ingram filed for rehabilitation under Chapter XI on July 6, 1976. This, of course, stayed the state court proceeding. Woods-Tucker then petitioned the bankruptcy court for reclamation of the farm equipment. Hutcheson-Ingram and its receiver counterclaimed, alleging that the transaction with Woods-Tucker was not a sale-leaseback but a usurious secured loan. At the time Hutcheson-Ingram filed this Chapter XI petition, some of the farm equipment had been liquidated in the state court proceedings, and the registry of the court contained $16,000 from the sale of the farm equipment. The parties stipulated that whoever prevailed on the petition for reclamation in the bankruptcy court would be entitled to that $16,000. The remainder of the farm equipment that had not been liquidated in connection with the state court proceeding was sold at public auction by the bankruptcy receiver for $27,200. Thus, if Woods-Tucker prevails in this action, it will receive $16,000 plus $27,200 less costs of the receiver's sale.
 
 
 9
 The bankruptcy court first held that Hutcheson-Ingram could introduce parol evidence that Woods-Tucker had granted it an oral option to repurchase the equipment at the end of the lease term. The court then went on to hold that the sale-leaseback transaction was a secured loan and a contrivance to evade the usury laws of Texas. Applying Texas conflicts rules, the bankruptcy court refused to give effect to the Mississippi choice of law provision in the "lease." The court held the loan violated Texas Civil Statutes Ann. Article 5069-1.02 (1971) and that Woods-Tucker was subject to penalties under Article 5069-1.06 (1971) for exacting more than twice the lawful rate of interest of ten percent. It then entered judgment awarding Hutcheson-Ingram the following relief:[2] $75,000, twice the amount of usurious interest contracted for; $35,000, the principal paid by Hutcheson-Ingram to Woods-Tucker; $8,500, the security deposit; $81,500 for attorney's fees; and cancellation of the debt. The bankruptcy court also decreed that Hutcheson-Ingram could recover the $16,000 in the state court registry and the net proceeds from the bankruptcy receiver's sale of the remaining farm equipment.
 
 
 10
 Woods-Tucker appealed to the district court. Organizing its opinion in a manner that we shall follow, the district court first determined what law applies to the case. The court held that the bankruptcy court was clearly erroneous in finding that the transaction between Hutcheson-Ingram and Woods-Tucker was a contrivance to evade Texas usury law. Applying Texas choice of law rules, the district court gave effect to the choice of law provision in the lease and held that Mississippi usury law governs the case. Mississippi law, the district court concluded, sweeps away parol evidence and statute of frauds objections to evidence extrinsic to a written agreement when that extrinsic evidence shows that the substance of a transaction is a usurious loan. Based in part on extrinsic evidence, the district court concluded that the sale-leaseback transaction was in fact a usurious loan. The district court then applied the Mississippi usury penalties and held that Hutcheson-Ingram was entitled to: cancellation of all indebtedness to Woods-Tucker; return of the $35,000 paid to Woods-Tucker; return of the $8,500 security deposit; the $27,200 held by the receiver from the sale of some of the farm equipment; and the $16,000 held in the registry of the state court. The district court also vacated and remanded for further consideration under Mississippi law the district court's award of attorney's fees. The district court, however, noted that the bankruptcy court's award of attorney's fees was not clearly erroneous. It vacated the award of the bankruptcy court because that award was based in part on Hutcheson-Ingram's recovery in the bankruptcy court, which its judgment reduced.
 
 
 11
 Woods-Tucker appealed to this court, asserting for a variety of reasons that the bankruptcy court and the district court erred in determining that the sale-leaseback was a loan. Woods-Tucker does not argue that if the transaction was a loan, the loan was not usurious. Nor does Woods-Tucker argue that either the bankruptcy court or the district court improperly awarded damages under Texas or Mississippi law. Hutcheson-Ingram has cross-appealed from the judgment of the district court. It asserts the district court erred in determining that Mississippi usury law governs the transaction under Texas choice of law rules.
 
 III. Choice of Law
 
 12
 The first issue to be decided is what choice of law rule to apply. The obvious choices are the choice of law rule of the state in which the bankruptcy court sat, Texas or a federal choice of law rule. According to Professor Moore, "In federal matters, where conflicts of law questions arise for determination, a federal court is not bound by the forum state's conflicts rules and can apply whatever law in its independent judgment it deems applicable to the controversy." 1A Moore's Federal Practice P 0.325 (1979). The Supreme Court left this question open in McKenzie v. Irving Trust Co., 323 U.S. 365, 371, n.2, 65 S.Ct. 405, 408, n.2, 89 L.Ed. 305 (1945). One year later, however, in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161-162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946), the Court intimated that a bankruptcy court should look to the conflicts law of the state with the most significant contacts to the transaction in issue when federal law does not clearly govern.
 
 
 13
 The instant case involves a usury claim by a Texas debtor. No federal law clearly governs. We hold that the bankruptcy court properly applied Texas choice of law rules to determine whether Texas usury law or Mississippi usury law governs this case. Texas has the most significant contacts with the transaction in issue here. The transaction involved a Texas borrower for whose protection the Texas usury laws were enacted (the Mississippi usury laws were not enacted to protect Texas borrowers). Applying Texas choice of law rules, which like Texas usury law, have been interpreted to protect Texas borrowers is consistent with the federal bankruptcy policy of affording relief to debtors. Finally, Texas choice of law rules will produce a determination of the rights and liabilities of the parties to the transaction in issue here uniform with the other forums in which those rights and liabilities could be adjudicated. Those forums are, in all likelihood, the Texas state courts or the Texas federal courts sitting in diversity.[3]
 
 
 14
 The Texas choice of law cases establish a strong policy of protecting Texas debtors. There is occasional language in the cases that could lead to a contrary result, but the facts of the cases reinforce the policy of protecting Texas debtors. In Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891), the court stated the general rule that the citizens of two different states contracting to make a loan could agree to an interest rate lawful under either state's usury law. The borrower in Dugan was a Texas citizen who took out a $5,000 note from an English mortgage company through his New York agent. The note was payable in New York; it was secured by a deed of trust on Texas land; and it provided that its validity was to be governed by Texas law. The court upheld the validity of the note under the general rule quoted above.
 
 
 15
 The court also noted that there was an exception to the general rule, which did not happen to apply in the case before it.
 
 
 16
 It must be kept in view that usury laws cannot be evaded under cover of naming a state whose laws shall control the contract.
 
 
 17
 It is difficult, however, to conceive how that result can ever proceed from the state of the actual residence of the debtor being named.
 
 
 18
 79 Tex. at 253, 14 S.W. at 1026. Dugan thus establishes that a contractual stipulation that the usury laws of the borrower's state shall control cannot be an evasion giving rise to an exception to the general rule stated above.
 
 
 19
 Six years after Dugan, in Building & Loan Association of Dakota v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897), the Texas Supreme Court interpreted the exception established in Dugan to protect Texas borrowers from contractual manipulations that would otherwise have robbed the borrowers from the protection of their own usury laws. In Griffin, the lender had been organized in Dakota, but it had a permit to do business in Texas. The borrower lived in Texas, all his property was in Texas and the deed of trust securing the loan was on Texas property. The loan, however, called for payments to be made in Dakota. The lender argued that Dakota usury law controlled the case because Dakota was the place of performance for the loan.
 
 
 20
 The court acknowledged the general rule, "that a contract which is to be performed in a state other than that in which it is made may reserve interest according to the laws of either state." The court stressed the exception to the general rule i.e., Texas does not tolerate contrivances intended to evade its usury laws. The court then went on to hold that the contract, "In so far as it provide(s) . . . for . . . payment . . . in . . . Dakota (is) a device to evade the laws of this state" as a matter of law. 90 Tex. at 488, 39 S.W. at 659.
 
 
 21
 The court in Griffin reached its result be applying a policy of borrower protection. In quoting a decision of the North Carolina Supreme Court, it recognized the fact that foreign lenders could easily evade the Texas usury laws if it upheld the validity of choice of law provisions in loans naming a state other then the borrower's. "(A)ll lenders . . . could express in (their loans) that payment is to be made at some place in a country where no usury laws exist, reserving a rate of interest, by which device all the business of the state could be done upon the same plan as in this case, in defiance of our law."[4] 90 Tex. at 491, 39 S.W. at 660. The Court concluded its analysis in Griffin with a comparison of the interests of Dakota and Texas in having the contract interpreted under their laws. The contract was not made with the intention that it should be enforced or performed in Dakota so, the Court held, there was no conflict between the laws of Dakota and Texas. Finally, the Court concluded that to not apply the Texas usury laws to the contract would annul the Texas usury statutes. Cf. Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979) (rejecting the conflicts rule of lex loci in torts and adopting a flexible rule of applying the law with the most significant relation to the tort).[5]
 
 
 22
 Recent cases from courts of civil appeals in Texas have adopted both the language and the principles of Griffin. The borrower in Securities Investment Co. v. Finance Acceptance Corp., 474 S.W.2d 261 (Tex.Civ.App. Houston (1st Dist.) 1971, writ ref'd n.r.e.), was a Texas consumer finance company that sued the Missouri company from which it borrowed its operating capital. The loan agreement between the parties provided that it was to be governed by Missouri usury law, which does not allow a corporation to assert a usury defense. The court upheld this choice of law provision, noting that the borrower had not pled that the agreement was a subterfuge or a device to evade Texas law and had not developed any evidence of a subterfuge or contrivance. The court stressed the fact that the lender had an office in Missouri, had no office in Texas, and that the collateral securing the loan was forwarded to the lender in Missouri. In contrast, Texas property secured the loan in Griffin and the lender in Griffin was licensed to do business in Texas.
 
 
 23
 Similarly, in the instant case, the lender had offices in Texas, and the collateral securing the loan was in Texas. The borrower in the instant case pled and proved that the sale-leaseback transaction was a device to evade the usury laws of Texas. The bankruptcy court expressly so found and we affirm that finding as not being clearly erroneous on two grounds. First, the fact that the parties in this case styled their transaction as a sale-leaseback instead of a secured loan supports a finding of a device or contrivance to evade the Texas usury laws. Second, the provision in the agreement in this case that the laws of Mississippi shall apply is a device to evade the Texas usury laws just as the provision that payments on the loan in Griffin be made in Dakota was conclusive evidence of a device to evade the Texas usury laws. As stated in Griffin, the state of the foreign lender has no real interest in applying its usury laws to a Texas debtor,[6] and any attempt by the foreign lender to manipulate the contract terms so that the laws of a state with no interest in the contract will apply is a device to evade the Texas usury laws.
 
 
 24
 The cases discussed above indicate that Texas applies its choice of law rules so that the Texas laws protect Texas borrowers. In High Fashion Wigs Profits Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App. Eastland 1979, no writ hist.), the court applied Texas choice of law rules so that the Oklahoma usury laws would protect an Oklahoma borrower. There, a New Jersey lender agreed to supply construction financing to two Oklahoma borrowers for the construction of an office building and apartment in Lubbock, Texas. The agreements between the borrowers and the lender were negotiated in Oklahoma and New Jersey. The loans provided that they were to be governed by Oklahoma law, or alternatively New Jersey law. While the opinion does not indicate whether these choice of law provisions were negotiated, they were apparently drafted for the single loan between the borrower and the lender. In contrast, the choice of law provision in the instant case was buried at the bottom of the back page of a preprinted form offered to the borrower on a take it or leave it basis. In High Fashion Wigs, the lender made its disbursements in Oklahoma and mailed its interest statements to Oklahoma. The trial court found that the agreement was free of any taint of sham, subterfuge, or coercion and that Oklahoma bore a reasonable relation to the parties and their transactions. Holding that probative evidence supported the trial court's finding, the court of appeals affirmed. Going back to the interest analysis first set out in Dugan and Griffin, this case simply illustrates an application of Texas choice of law rules to apply the usury laws of the borrower's state.
 
 
 25
 Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979) sanctions the emphasis this Court places on interest analysis in choice of law. In that case, the Texas Supreme Court rejected the lex loci conflicts rule in torts in favor if a conflicts rule applying the law of the state with the most significant relation to the tort. The reasons the court gave for abandoning lex loci apply with equal force to any conflicts rule contrary to the one we use here. Those reasons were that lex loci ignores the very substantial interest of the forum state, that lex loci led to judicial maneuvering, and that the ease of administration is an inadequate reason to retain an unjust rule. 583 S.W.2d at 317. We interpret the cases as establishing a rule that notwithstanding a contrary provision in an agreement, Texas will apply the usury laws of the borrower's state. There is an exception to this rule when the agreement names the law of a state other than the borrower's as controlling and the borrower fails to plead and prove that state has no interest in the transaction. The mere fact that a lender resides in a state does not give that state an interest in applying its usury laws to the borrowers of another state. Furthermore, any contacts with the foreign state that the lender can manipulate in its favor by agreement, such as the requirement that payments be made in the foreign state or the loan be accepted there, do not create contacts sufficient to involve the interest of the foreign state. See, Comment, Usury and the Conflict of Laws: The Doctrine of Lex Debitoris, 55 Calif.L.Rev. at 183-188.
 
 
 26
 The argument remains that the rule just enunciated will interfere with the expectation of the parties who enter into a loan agreement that stipulates the law of a state other than the borrower's will apply. In the usury field, the expectations of the parties really mean very little. In a case in which a particular state's usury law clearly governs a loan, the lender should not be heard to argue to a court that its extraction of an usurious rate of interest should stand to justify the expectation of the parties. Similarly, when a lender uses its bargaining power to extract a choice of law provision in addition to an excessive rate of interest, the lender cannot argue successfully that the court must enforce that choice of law provision to justify the expectation of the parties. The expectation of the parties can be little more than a self-fulfilling prophecy. If the courts take the position that choice of law provisions are worth very little in usury cases, neither the lender nor the borrower can expect them to be enforced. The necessitous borrower, for whose benefit the usury laws were enacted, expects to obtain a sum of money in exchange for assuming a future obligation. This expectation predominates to the point of extinguishing any other expectation. Frequently, as in this case, the borrower may not even read the agreement he signs, and his expectations cannot include the honoring by a court of some provision in fine print on the back of a contract.
 
 
 27
 Finally, we must address the argument that this decision will interfere with commerce and make loans less available to would be Texas borrowers. The interest rate on the loan in this case was 20.46 percent, just over twice the allowable rate under the Texas usury laws. This Court recognizes that in the time between the loan in the instant case was made and this decision was written, the prime rate that national banks charge their best customers has reached twenty percent. The Wall Street Journal, April 4, 1980, at 5, Col. 4. Yet, Woods-Tucker is subject to substantial penalties under Texas law for charging 20.46 percent to the borrower in this case. The argument that this decision will make loans less available to Texas borrowers is an argument to the Texas Legislature to amend its usury laws. Cf. The Wall Street Journal, March 28, 1980, at 2, Col. 3 ("Financial-services companies, complaining that state usury laws keep them from passing along the high cost of money are moving to curtail their consumer-loan obligations."). It is not an argument for this Court or any other court to engage in the judicial maneuvering referred to in Gutierrez. Here, that maneuvering would take the form of twisting the Texas choice of law rules in usury cases to give effect to contractual choice of law provisions naming as controlling the law of a state with no interest in the agreement. Such a twisting would have four untoward effects. First, it would place the Court in an improper role. Second, it would lessen the demand for reform of the usury laws. (We do not intimate that this demand is legitimate, only that the courts should not interfere with whatever demand there is.) Third, it would give an unfair advantage over domestic lenders to foreign lenders who set up shop in Texas. Fourth, the damage done by twisting the choice of law rules now might be difficult to undo, leaving Texas borrowers without protection even if the usury laws were amended.[7]
 
 
 28
 IV. Extrinsic Evidence to Show the True Nature of the Transaction
 
 
 29
 Having determined that Texas usury law governs this case, we must now determine whether evidence extrinsic to the documents in this case is admissible to show that the transaction evidenced by the documents was a secured loan rather than a sale-leaseback.[8] Transamerican Leasing Co. v. Three Bears, Inc., 586 S.W.2d 472 (Tex.1979) requires Hutcheson-Ingram to show that its lease agreement with Woods-Tucker included a purchase option in order for it to show that it was a victim of a usurious loan. The trial court in Transamerican Leasing excluded evidence that tended to show that the parties to a written lease of restaurant equipment had an oral agreement giving the lessee an option to purchase the leased equipment at the end of the lease term. The Supreme Court affirmed the trial court. Reasoning that the lease had an integration clause[9] so that the claimed oral purchase option was inconsistent with the lease, not merely collateral to it, the court held that the parol evidence rule applied. See also Hobbs Trailers v. J. T. Arnett Grain Co., 560 S.W.2d 85, 87 (Tex.1977) (excluding evidence of an oral purchase option to a lease agreement that included an integration clause and a statement that, "This transaction is a leasing and not a sale, conditional or otherwise.")
 
 
 30
 The lease between Hutcheson-Ingram and Woods-Tucker did not include an integration clause. The admission of testimony concerning the oral option did not violate the parol evidence rule because the oral option was collateral to, not inconsistent with, the lease agreement. There is nothing inconsistent between an agreement for a lease of property for a particular period of time and another agreement for the sale of that property at the end of that time. The inconsistency only arises when the lease agreement provides that it is the entire agreement between the parties regarding the subject property. The bankruptcy court therefore did not err in admitting the testimony of Skip Hutcheson that Ray Howell, the salesman for Woods-Tucker, had given him an oral option to purchase, at the end of the lease term, the farm equipment sold to and then leased from Woods-Tucker. Hutcheson testified that the price of this option was simply forfeiture of the $8,500 security deposit already paid by Hutcheson-Ingram.
 
 
 31
 Woods-Tucker asserts that Howell had no authority to grant an oral purchase option and that Howell could not establish authority solely by his own statements. Here, Howell's authority to grant a purchase option was apparent. He was a Woods-Tucker representative authorized to negotiate leases. Furthermore, there was testimony at trial that it was standard procedure for Woods-Tucker to grant oral purchase options. In fact, the trial testimony indicated that if a lessee requested a written purchase option, Woods-Tucker would attempt to dissuade him by saying the Internal Revenue Service would view the lease as a loan if the purchase option were put in writing.
 
 
 32
 Hutcheson-Ingram also contends the bankruptcy court erred in allowing testimony regarding the oral purchase option into evidence because that testimony violated the statute of frauds. Woods-Tucker asserts that two separate statute of frauds provisions apply in this case. First, U.C.C. § 2-201(1), Tex. Bus. & Com. Code Ann. § 2.201(a) (1968), which provides that
 
 
 33
 Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . .
 
 
 34
 This provision does not require the exclusion of testimony that there was an oral purchase option. Hutcheson-Ingram is not seeking to enforce its oral purchase option. It seeks only to show that an option existed to shed light on the true nature of its agreement with Woods-Tucker. Furthermore, U.C.C. § 2-201(1) is expressly subject to U.C.C. § 2-201(3)(c). The statute of frauds does not apply "with respect to goods for which payment has been made." Here, the option price was $8,500, which Hutcheson-Ingram paid to Woods-Tucker at the beginning of the lease term. Hutcheson-Ingram's performance of its obligations under the oral purchase option took the option out of the statute of frauds.
 
 
 35
 The other arguably applicable statute of frauds provision is Texas Business and Commerce Code Annotated § 26.01(b)(6) (1978), which provides that, "An agreement which is not performed within one year from the date of making" is not enforceable unless it is in writing. Again, Hutcheson-Ingram does not seek to enforce its oral purchase option. Hutcheson-Ingram's payment of the option price within one year from the granting of the option takes the option out of the statute of frauds. See Wynnewood State Bank v. Brigham, 434 S.W.2d 874 (Tex.Civ.App. Texarkana 1968, writ ref'd n. r. e.); 2 Corbin on Contracts § 457 (1950).
 
 
 36
 Thus, the bankruptcy court did not err in admitting evidence that Woods-Tucker granted Hutcheson-Ingram an oral option to purchase at the end of the lease period. Evidence tending to show that the lease in this case was part of a lease-purchase agreement allows Hutcheson-Ingram, under Transamerican Leasing, to show that the lease was in fact a loan.
 
 
 37
 V. Secured Loan or Sale-Leaseback?
 
 
 38
 The bankruptcy court and the district court both concluded that the sale-leaseback transaction between Hutcheson-Ingram and Woods-Tucker was a secured loan subject to the usury laws. We reject Woods-Tucker's argument that the lower courts erred in their conclusion. U.C.C. § 1-201(37), Tex.Bus. & Com.Code Ann. § 1.201(37) (1978) defines the test for deciding whether a lease is really a secured loan for the purpose of determining the applicability of Article 9 of the U.C.C. That section provides that
 
 
 39
 Whether a lease is intended as security (for a loan) is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.
 
 
 40
 In Davis Brothers v. Misco Leasing, Inc., 508 S.W.2d 908, 76 A.L.R.3d 1 (Tex.Civ.App. Amarillo 1974, no writ hist.), the court interpreted U.C.C. § 1-201(37) to require first an inquiry into whether there is a purchase option and whether the option price is nominal or substantial. If there is an option and the option price is nominal in relation to the fair market value of the equipment subject to it, then the lease is, conclusively, a secured loan.[10] If the option is not nominal the court must look to all the facts surrounding the transaction to determine whether there is a lease or a loan.
 
 
 41
 A very recent decision from a Texas court of civil appeals adopts the Davis Brothers test of determining whether the option in the lease is nominal for the purpose of deciding whether the lease is a loan subject to the usury statutes. Brokers Leasing Corp. v. Standard Pipeline Coating Co., 602 S.W.2d 278 (Tex.Civ.App. Dallas, No. 20150, April 14, 1980), noted in 17 Texas Lawyers Weekly Digest No. 26 (1980). There, the court found that a transaction styled as a lease was, in fact, a lease rather than a loan. The court relied on the fact that the option price of $2,235 was by the terms of the contract considered the fair market value of the property subject to the lease, and that testimony at trial indicated that the equipment would be worth $6,900 at the end of the lease term. Similarly, in Southwest Park Outpatient Surgery, Ltd. v. Chandler Leasing Division, Pepsico Leasing Corp., 572 S.W.2d 53 (Tex.Civ.App. Houston (1st Dist.) 1978, no writ hist.), the court held that a lease was not a conditional loan subject to the usury laws because the option price under the lease was the fair market value of the property subject to the lease. The court in Security Life Insurance Co. v. Executive Car Leasing Co., 433 S.W.2d 915 (Tex.Civ.App. Texarkana, writ ref'd n. r. e.), relied on the fact that the agreement between the parties did not include any purchase option in holding that the agreement was not subject to the usury laws. The court also looked to the surrounding circumstances, including the fact that the parties approached each other seeking to execute a lease, not a loan.
 
 
 42
 Given the nominal option test of Brokers Leasing and the reliance that the court in Security Life Insurance Co. placed on facts surrounding the transaction, we think that U.C.C. § 1-201(37) sets forth the proper test for determining whether a transaction styled as a lease is a loan for the purpose of the usury statutes.
 
 
 43
 In the instant case, Hutcheson-Ingram failed to introduce any direct evidence of the fair market value of the farm equipment at the end of the lease period. The bankruptcy court noted that the leased property had been liquidated for over $40,000 in forced liquidation sales. Had the bankruptcy court chosen to rely on this fact for a finding that $8,500 was a nominal consideration to pay for the equipment, that would have ended the matter. The court, however, chose not to make such a finding. Instead, it applied the general rule of U.C.C. § 1-201(37) that a consideration of all relevant facts determines whether the transaction was, in fact, a loan rather than a lease.
 
 
 44
 The parol evidence rule under Texas law does not prevent an examination of the facts surrounding the transaction in this case for the purpose of determining whether that transaction was a loan subject to the usury laws. As the district court noted, quoting from Corbin,
 
 
 45
 A bargain for a loan can easily be disguised in other forms to which the usury laws appear not to be applicable. As in the case of all other illegal bargains, the court will penetrate the disguise if it can and make the provisions of the usury statute effective . . . parole testimony in all relevant circumstances are admissible in evidence.
 
 
 46
 6 Corbin on Contracts § 1501 (1951). The Transamerican Leasing and Hobbs Trailer cases discussed above must be seen as an exception to this rule. The exception applies only to parol evidence of prior agreements inconsistent with the written agreement of the parties. It does not apply to collateral agreements or to evidence of surrounding circumstances. For example, in Wilbanks v. Wilbanks, 160 Tex. 317, 330 S.W.2d 607, 608 (1960), the court stated that "a deed absolute on its face may be shown by parol evidence to have been intended as a mortgage given to secure a debt owing to the grantee by the grantor." In Gonzales County Savings & Loan Association v. Freeman, 534 S.W.2d 903 (Tex.1976), the court remanded the case for an examination of extrinsic evidence to determine whether a charge in a note labeled as a "loan fee" was usurious interest rather than a legitimate loan commitment fee. See also Stedman v. Georgetown Savings and Loan Association, 595 S.W.2d 486 (Tex.1979).
 
 
 47
 The bankruptcy court properly concluded that based on the facts in this case Hutcheson-Ingram's sale and leaseback of the equipment was a loan. Among those facts are the following:
 
 
 48
 1. The substantial difference between the market value of the subject property and its "sale" price. Here, Woods-Tucker "bought" property it valued at $197,000 for $85,000. Compare Napper v. Johnson, 464 S.W.2d 496 (Tex.Civ.App. Waco 1971, writ ref'd n. r. e.) (property worth between $50,000 and $60,000 "sold" for $14,950 in a mortgage transaction) with Rinyu v. Teal, 593 S.W.2d 759 (Tex.Civ.App. Houston (14th Dist.) 1979, no writ hist.) (payment of $4,750 for cloudy title to fifteen acres of land and for the seller's almost "non-existent equity" in 77.8 acres that were posted for foreclosure the day after the sale indicates a sale rather than a loan).
 
 
 49
 2. The amount of "rent" paid was based on the amount of the advance by the "lessor" rather than the value of the property. See Comment, Real Estate Sale-Leaseback Agreements Under Texas Usury Law: Circumvention or Sale?, 7 St. Mary's L.J. 821 (1976). In the instant case, Woods-Tucker valued the farm equipment subject to the lease at $197,000, but it determined the rental it charged for that equipment by applying an add on interest rate to the amount it advanced to Hutcheson-Ingram.
 
 
 50
 3. Hutcheson-Ingram approached Woods-Tucker seeking to borrow money, not to sell its equipment. Woods-Tucker responded by asking what collateral Hutcheson-Ingram had and then saying that the transaction would have to be "structured" as a sale-leaseback. See generally Security Life Insurance Co., 433 S.W.2d at 917.
 
 
 51
 4. Woods-Tucker maintained no inventory of equipment that it "leased" to parties like Hutcheson-Ingram. From this fact it can be inferred that the lessees retained the leased property at the termination of their leases. See Davis Brothers v. Misco Leasing.
 
 
 52
 5. The "lease" required Hutcheson-Ingram to pay all taxes, insurance, and expenses for repairs of the subject property. Id.[11]
 
 
 53
 Woods-Tucker argues strenuously that the transaction in issue here was a lease because both parties to the lease treated it as such for federal income tax purposes. Woods-Tucker even goes so far to accuse Hutcheson-Ingram of fraud in taking a position on its federal income tax returns that the transaction in issue here was a lease and a position before this Court that the transaction was a loan. The meaning of every word varies with its context. The transaction between Hutcheson-Ingram and Woods-Tucker could be a true lease for federal tax purposes and a loan for state usury law purposes. Each of these substantive areas of law will define and distinguish between loans and leases based their underlying purposes and policies. Tax law and usury law purposes and policies differ. Therefore, they define loans and leases differently. The treatment of a transaction for federal tax purposes has little relevance to whether that transaction is a loan or a lease within the meaning of state usury law.
 
 VI. Conclusion
 
 54
 The first issue in this case was whether the application of a federal choice of law rule or a state choice of law rule was proper in bankruptcy. It was determined that the bankruptcy court properly applied Texas choice of law rules as the policies embodied in Texas choice of law rules that protect Texas borrowers are consistent with the general policy of the Bankruptcy Act to provide relief to debtors. It was next decided that the Texas courts would hold that the provision in the lease designating Mississippi law as controlling was a contrivance to evade the Texas usury laws. The provision was a contrivance because it named as governing the laws of a state with no interest in having its usury laws applied to the transaction in issue. This contrivance voided the choice of law provision and required the application of Texas usury law. Texas law allows proof of the oral option to purchase because the lease agreement did not contain an integration clause. Finally, looking to the surrounding facts and circumstances under Texas law, the sale-leaseback transaction was, in fact, a secured loan subject to the Texas usury laws.
 
 
 55
 Woods-Tucker has not asserted that the bankruptcy court misapplied the Texas usury laws if those laws govern and the transaction was a loan rather than a lease. This applies to the bankruptcy's court award of attorney's fees as well. The district court has already decided that the bankruptcy court's award of attorney's fees was proper if Texas law controls. Accordingly, the bankruptcy court judgment must stand. We vacate the judgment of the district court and remand for entry of judgment affirming the bankruptcy court.
 
 
 56
 VACATED AND REMANDED.
 
 
 57
 TATE, Circuit Judge, concurring in part and dissenting in part:
 
 
 58
 I cannot join the majority in its resolution of the threshold question of which state's law should provide the rule of decision in this case. (I do, however, agree with its resolution of the other issues of the appeal.[1]
 
 
 59
 In my view, the majority has misperceived the nature of the question before this court. To be decided by us is a fundamental question of national commercial law that should be resolved in furtherance of the overriding policy of national uniformity ratified by the legislature of Texas when it adopted the Uniform Commercial Code. The issue is not, as the majority characterizes it, a simple choice of law question to be resolved by balancing the competing state policies embodied in the respective usury laws of Texas and Mississippi.[2]
 
 
 60
 Perhaps, as a practical matter, no great harm is done by invalidating the party choice of law in the present case: the loan is usurious in both Texas and Mississippi. But what if it were not? What if the party choice of lender law had served to validate a transaction usurious under borrower law? Would the "strong policy" perceived by the majority in the Texas jurisprudence override the party choice of law, invalidate the transaction (non-usurious in the state where executed), and subject the lender to the usury penalties of the borrower's state? Might the result in that circumstance differ? Might the result differ depending on whether the courts of Texas or of Mississippi were addressing the issue?
 
 
 61
 These questions suggest the basic flaw that I perceive in the majority's approach: It has settled upon a rationale that pits the parochial policies underlying the usury laws of a single jurisdiction irreconcilably against the policy of national uniformity embodied in the Uniform Commercial Code, and has done so unnecessarily.
 
 
 62
 I am not inclined to believe the courts of Texas would likewise overlook the UCC choice of law enacted by the Texas legislature, in the interest of a uniform national commercial law, by which transactions would be similarly enforceable by the courts of whatever jurisdiction in which suit is brought. My distinguished brethren of the majority err, in my opinion, in presuming otherwise.
 
 I.
 
 63
 Although the majority correctly determined that Texas should provide the rule by which the choice of law would be made in these bankruptcy proceedings, Vanston Bond Holders Protective Committee v. Green, 329 U.S. 156, 161-162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946), it nevertheless proceeded, in my view, incorrectly to select an inappropriate Texas rule.[3] The statutorily-applicable rule is that found in Section 1.105(a) of Texas' version of the UCC:
 
 
 64
 Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.
 
 
 65
 Tex.Bus. & Com.Code Ann. tit. 1, § 1.105(a) (Vernon Supp.1979), UCC § 1-105(1) (1972 version). Pre-UCC choice of law jurisprudence, relied upon for guidance by the majority, is an inappropriate basis for decision, in the face of this legislative replacement of jurisprudential choice of law rules by a statutory one.
 
 
 66
 The majority's error in this regard contravenes both Texas and Fifth Circuit decisions. As this court noted in Fredonia Broadcasting Corp., Inc. v. RCA Corp., 481 F.2d 781, 801 (5th Cir. 1973):
 
 
 67
 The Uniform Commercial Code sections (citing Vernon's Texas Business and Commercial Code) require that prior Texas case law give way. No Texas case nor any other state court in this Circuit has faced this exact problem. Therefore, we look to the provisions of the Uniform Commercial Code for an interpretation, as would a Texas state court.
 
 The Texas courts are in accord:
 
 68
 To the extent that prior case law conflicts it is supplanted by the Code. The objective of the Uniform Commercial Code, or any code, is to displace scattered legislation and decisional law, and to state as fully as practicable a comprehensive and workable set of rules and principles for the governing of all aspects of transactions in the field to which it applies.
 
 
 69
 Pacific Products v. Great Western Plywood, 528 S.W.2d 286, 291 (Tex.Civ.App. Ft. Worth 1975) (citations omitted).
 
 
 70
 In looking to the pre-UCC jurisprudence for the available choice of law rule in this case, the majority has fallen into a basic methodological error that obscures the issues truly at stake and threatens to undermine the fundamental objectives of the uniform commercial laws adopted by the state legislatures of this nation.
 
 II.
 
 71
 Section 1.105 establishes the rule that parties to a multi-state transaction are free to choose the law that will govern their rights and obligations so long as the jurisdiction whose law is chosen bears a "reasonable relation" to their transaction. Tex.Bus. & Com.Code Ann. tit. 1, § 1.105, Comment 1 (Vernon 1968), UCC § 1-105, Comment 1 (1962 version).
 
 
 72
 The substantive content of this "reasonable relation" test is illuminated by the case of Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 Tex.Bus. & Com.Code Ann. tit. 1, § 1.105, Comment 1 (Vernon 1968), UCC § 1.105, Comment 1 (1962 version). Seeman dealt with a loan from a Pennsylvania lender to a New York borrower under conditions held to be usurious under New York law but non-usurious under Pennsylvania law. The contract did not contain a choice of law provision, but did provide for repayment of the loan in Pennsylvania. The United States Supreme Court stated the rule that, in order to further "a policy of upholding contractual obligations assumed in good faith," it would allow parties to contracts made in one state but to be performed in another to stipulate for the higher of the two applicable rates of interest. The Court went on to state:
 
 
 73
 A qualification of (this rule), as sometimes stated, is that the parties must act in good faith, and that the form of the transaction must not "disguise its real character." As thus stated, the qualification, if taken too literally, would destroy the (rule itself) for (it) obviously (is) to be invoked only to save the contract from the operation of the usury laws of one jurisdiction or the other. The effect of the qualification is merely to prevent the evasion or avoidance at will of the usury law otherwise applicable, by the parties' entering into the contract or stipulating for its performance at a place which has no normal relation to the transaction and to whose law they otherwise would not be subject. Wharton, . . . in discussing this qualification, says: "Assuming that their real, bona fide intention was to fix the situs of the contract at a certain place which has a natural and vital connection with the transaction, the fact that they were actuated in so doing by an intention to obtain a higher rate of interest than is allowable by the situs of some other elements of the transaction does not prevent the application of the law allowing the higher rate."
 
 
 74
 Seeman v. Philadelphia Warehouse Co., 274 U.S. at 408, 47 S.Ct. at 628, (italics mine).
 
 
 75
 Read in the light of Seeman, the "reasonable relation" test of Section 1.105(a), adopted with specific comment reference to that decision, limits party autonomy in the choice of law only to the extent that it forbids them to select the law of a jurisdiction that has "no normal relation to the transaction." That the intent of their choice of law provision was to avoid the usury laws of some interested jurisdiction is immaterial they are perfectly free to do so. What they are forbidden to do is to evade those laws at will, capriciously or fraudulently, by selecting the law of a jurisdiction without a normal relation to the transaction or by contriving contacts with an otherwise non-interested jurisdiction so as to validate their choice of law:
 
 
 76
 Only when it is shown that the contract did not occur in the normal course of the transaction, but was contrived to validate the parties' choice of governing law, should the relationship be held unreasonable; in other cases the clause should be upheld. Courts should guard against combining notions of sovereignty in choice of law with the flexibility of the Code's "reasonable relation" test to strike down the selected law leaving the parties with an uncertainty which the Code was designed to eliminate.
 
 
 77
 Nordstrom & Ramerman, The Uniform Commercial Code and the Choice of Law, 1969 Duke L.J. 623, 628 (1969) (italics mine).
 
 
 78
 This reading of Section 1.105 is in keeping with the UCC's underlying purpose of establishing a nationally uniform law to govern commercial transactions. UCC § 1-102(b)(3), enacted in Texas as Tex.Bus. & Com.Code Ann. tit. 1, § 1.102(b)(3) (Vernon 1968).[4] The Code's devotion to the principle of party autonomy, particularly in the choice of law area, is but a reflection of that policy. By calling upon state courts to yield to party choices of law in multi-state transactions, except where it would be unreasonable to do so, the Code attempts to achieve uniformity. The uniformity arises from the ability of multi-state contractants to select the law that will govern their transactions in the full expectation that their choice will be respected by whatever court might chance to hear their dispute. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 3 (2d ed. 1980).
 
 III.
 
 79
 Having determined that UCC § 1-105 as adopted by the legislature of Texas is the applicable choice of law rule, and that such statutory section requires the courts of Texas to yield to the party choice if the chosen jurisdiction bears a reasonable relation to the transaction, we must now determine whether the courts of Texas have held or would hold that the relationship borne by Mississippi to this transaction is not reasonable within the meaning and application of Section 1.105(a).
 
 
 80
 It is clear from the record, and I would concur with the majority and the courts below, that the state of Texas has the most significant contacts with this transaction. The question, however, is not which state has the greater contacts, but rather whether Mississippi's contacts are sufficient to constitute a "reasonable relation" within the meaning of Section 1.105(a). Briefly stated, Mississippi's contacts with this transaction are as follows:
 
 
 81
 1. Mississippi is the site of the lender's home office, although the lender does have places of business in Texas.
 
 
 82
 2. The agreement was forwarded to Mississippi for acceptance by Woods-Tucker and was accepted there.
 
 
 83
 3. The borrowed money was sent from Mississippi to Texas.
 
 A.
 
 84
 Have Texas courts held that these contacts are insufficient?
 
 
 85
 My reading of the Texas decisions would indicate that they have not. The five cases cited by the majority simply do not support a contrary conclusion. Three of them upheld the party choice of law, and therefore cannot be said to indicate much, if anything at all, about the precise point at which a jurisdiction's contacts with the transaction become too tenuous to be "reasonable" (Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891); Hi-Fashion Wigs Profit Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App. Eastland 1979); Securities Investment Co. v. Finance Acceptance Corp., 474 S.W.2d 261 (Tex.Civ.App. Houston (1st Dist.) (1971)). A fourth case, Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979), is a tort case, not involving any party choice of law, the "reasonable relation" test of Section 1.105(a), or the policy considerations that arise in multi-state commercial transactions, and is thus inapposite to the case before us. The fifth case, Building and Loan Ass'n of Dakota v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897), involves a commercial situation similar to the present one (although lacking some foreign state contacts present in the instant case); it is the only decision cited which does overturn a party choice of law.
 
 
 86
 Griffin, however, is a pre-UCC case, decided in 1897 without consideration of the policies underlying the UCC and adopted in Texas by its legislature through the enactment of the Texas UCC in 1967. To the extent that its result would differ from that under Section 1.105(a), Griffin's choice of law rule has been supplanted by Texas UCC § 1.105(a). See Pacific Products v. Great Western Plywood, 528 S.W.2d 286, 291 (Tex.Civ.App. Ft. Worth 1975), quoted in Part I of this dissent. Griffin is persuasive authority that, prior to the 1967 enactment of the Texas UCC by the Texas legislature, the Texas courts might have dishonored the party choice of law, as did the present majority under the circumstances before us. Nevertheless, Griffin is arguably distinguishable as based upon a factual determination that the jurisdiction selected by the parties had no contacts at all with the transaction: The parties did not really intend their contract to be performed there, and the only other contact was that it was the lender's state of incorporation but the court found that the lender had become domiciled in Texas for the purpose of lending money. Building and loan Ass'n of Dakota v. Griffin, 90 Tex. at 488, 39 S.W. at 659. The court held that the Texas lender's agreement to pay the debt incurred in Texas at the home office of the foreign corporation was merely a "contrivance . . . intended to evade the laws" of Texas. Id.
 
 
 87
 Cited decisions, insofar as they are even apposite to the present case, do not demonstrate that Texas courts will apply Texas choice of law rules so as always to assure the application of the usury laws of the borrower's state. On the contrary, they exemplify a conflicts rule honoring party choices of law that is abrogated only upon clear evidence that the party choice is unreasonable within the meaning of Section 1.105(a). No other cases cited by the parties, cited by the majority, or located by this writer would lead to any other conclusion.
 
 
 88
 Since Texas has not ruled upon the particular facts that now face this court, we should seek to decide as would the high court of that state. Fredonia Broadcasting Corp., Inc. v. RCA Corp., 481 F.2d 781, 801 (5th Cir. 1973).
 
 B.
 
 89
 As noted above, the state of Mississippi is not devoid of contacts with this transaction it is the site of the lender's home office, the place of acceptance of the contract, and the place from which the loaned money was sent. Would the courts of Texas hold these contacts insufficient if faced with the question now before this court? I do not think they would.
 
 
 90
 My own Erie guess is that these contacts, viewed in the light of UCC policy as ratified by the Texas legislature by its adoption of Section 1.105(a), would be found sufficient to constitute a reasonable relation between Mississippi and this transaction. Thus, the party choice of law would be honored unless it was found to constitute a contrivance to evade the usury laws of Texas.
 
 
 91
 Indeed, the basis upon which the bankruptcy court struck down the party choice of law, and upon which the majority affirmed that holding, is that the choice of Mississippi law was a contrivance to avoid the usury laws of Texas. I would affirm the district court's conclusion that that holding is clearly erroneous.
 
 The bankruptcy court held:
 
 92
 (T)he sale and leaseback transaction between Plaintiff and Debtor was not a true lease, (and) the transaction was, from the beginning, contemplated to be in the nature of a secured loan transaction. As such, it was more than a contrivance to evade the income tax laws of the United States. In looking to the substance of the contract, a contrivance exists likewise to evade the usury statutes of the State of Texas. This being so, the law of the State of Texas will govern in spite of any written provision in the contracts making the law of Mississippi applicable (Building and Loan Assn. v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897)).
 
 
 93
 In affirming this holding of the bankruptcy court the majority cites two grounds:
 
 
 94
 First, the fact that the parties in this case styled their transaction as a sale-leaseback instead of a secured loan supports a finding of a device or contrivance to evade the Texas usuary laws. Second, the provision in the agreement in this case that the laws of Mississippi shall apply is a device to evade the Texas usury laws just as the provision that payments on the loan in Griffin be made in Dakota was conclusive evidence of a device to evade the Texas usury laws. As stated in Griffin, the state of the foreign lender has no real interest in applying its usury laws to a Texas debtor, and any attempt by the foreign lender to manipulate the contract terms so that the laws of a state with no interest in the contract will apply is a device to evade the Texas usury laws.[5]
 
 
 95
 As is noted earlier in this dissent, both the bankruptcy court and the majority misconstrue the meaning of the contrivance "exception" upon which they rely. The "exception", which disallows the party choice when it is a "contrivance to evade the usury laws" of the forum state, is nothing more than a restatement of the rule itself: The party choice constitutes such a contrivance when 1) the contacts between the selected jurisdiction and the transaction do not establish a "reasonable relation" or 2) when the contacts themselves are contrived in order to validate a party choice of law. Under Section 1.105(a) and Seeman v. Philadelphia Warehouse Company and the principles derived therefrom, see Part II of this opinion, that the present transaction is itself a loan disguised as a sale and leaseback, or that the parties so disguised their transaction or chose the law of Mississippi in order to avoid Texas usury laws, is wholly immaterial so long as the contacts between Mississippi and the transaction are real.
 
 
 96
 Even if the Griffin case were controlling here (a point I do not concede[6]), it does not require the courts to dishonor the party choice of the lender's law under all circumstances in which the obligation is sought to be enforced in the borrower's forum. Griffin does not hold, as the majority suggests, that the state of a foreign lender has no real interest in applying its usury laws to a Texas debtor. The Griffin court expressly found that the lender in that case was not a foreign lender at all, having become domiciled in Texas for the purpose of lending money, and that the only remaining contact between the foreign state and the transaction was itself a contrivance since the parties did not really intend that the contract be performed in the foreign jurisdiction. Building and Loan Ass'n v. Griffin, 90 Tex. at 488, 39 S.W. at 659. Thus, the Griffin court, by virtue of its factual conclusions, was addressing a situation in which the contract stipulated for performance in, and for the application of the law of, a jurisdiction no more closely related to the transaction than was the Republic of China or the Duchy of Luxembourg.
 
 
 97
 No such contrivance is apparent in the present case. The contacts with Mississippi are real, they have occurred in the normal course of the transaction between these parties, and they are not so tenuous in their nature as to lead to the conclusion that they do not establish a "reasonable relation" between this transaction and the state of Mississippi. In this light, Section 1.105(a) requires that we honor the party choice of law, and I would affirm the district court's decision to do so.[7]
 
 Conclusion
 
 98
 In the instant case, the differences resulting from the application of Mississippi law rather than Texas law are rather small, being simply whether the Mississippi usury penalties should apply instead of the more rigorous Texas ones. Nevertheless, I believe the damage to law-development that is here done is more than merely theoretical. At best, the majority opinion serves to create a snag in the stream of jurisprudence in this circuit that will likely grow more disruptive before it is ultimately cleared away. At worst, it represents a fundamentally erroneous analysis and rationale which will, if followed subsequently, undermine the basic purposes of the UCC to assure a uniform national commercial law governing transactions equally in whatever jurisdiction sought to be enforced. In either event, we will better serve the legislative will of the Texas legislature in its adoption of the Uniform Commercial Code and the national commercial law sought through its enactment by the legislatures of forty-nine states by applying rather than ignoring the UCC choice of law provision here applicable.
 
 
 
 [1]
 The record does not reflect where Hutcheson approached Howell
 
 
 [2]
 These figures have been rounded off
 
 
 [3]
 Twenty-five years ago this Court faced issues similar to those with which we grapple here in Fahs v. Martin, 224 F.2d 387 (5th Cir. 1955). There, the Court determined that the federal rule and the Florida rule on choice of law in usury cases was the same and therefore it did not have to choose between the two. That rule is stated in Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891) and other Texas cases, but as discussed in the text, the Texas courts have developed an exception to the rule that ensures Texas usury law will protect Texas debtors
 
 
 [4]
 The loan in Griffin did not include a choice of law provision. The Court, however, treated the stipulation in the loan that payments be made in Dakota as the equivalent of a choice of law provision naming Dakota. This analysis is illustrated by the general rule of Griffin referred to in the text and the Court's reliance on the North Carolina case that overturned a choice of law provision
 
 
 [5]
 Gutierrez is discussed later in this opinion
 
 
 [6]
 It is . . . clear that the benefit (of a protective law) . . . is not intended for all men everywhere, but only for those who by virtue of their relationship to the state are within the legitimate scope of its governmental concern. . . . To apply (such laws) . . . for the protection of others, with whose welfare the state has no concern, may in some situations . . . constitute intermeddling so officious and unjustified as to amount to a denial of due process of law or of full faith and credit to the laws of a sister states
 Currie & Schreter, Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities, 69 Yale L.J. 1323, 1324 (1960), quoted in Comment, Usury and the Conflict of Laws: The Doctrine of Lex Debitoris, 55 Calif.L.Rev. 123, at 190, n. 366 (1967). It is also important to note that if a foreign lender comes into Texas and makes loans to Texas borrowers at ruinous interest, that Texas will bear the burden of the lender's actions. The lender's state will not. Those burden include relief roles and receivership proceedings swelled by Texas borrowers ruined by high interest.
 
 
 [7]
 High Fashion Wigs stated that U.C.C. § 1-105(1), Tex. Bus. & Com. Code Ann. § 1.105 (a) (1968), codified the law of Dugan v. Lewis. That section provides that, "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." This decision holds that under Dugan, Griffin, and their progeny the mere residence of a lender in a foreign state does not make that state bear a reasonable relation to a loan to a borrower in another state
 
 
 [8]
 In the discussion on the proper choice of law, it was repeatedly assumed that the transaction was a loan and not a sale-leaseback. That assumption was necessary to determine the proper choice of law rule. Having decided the choice of law issue the Court can now determine the validity of the assumption. There is a problem of circularity here. To determine the correct choice of law it was necessary to assume a loan, and now to determine whether there was a loan it is necessary to apply the choice of law reached assuming that there was a loan. The allegation of usury must be sufficient to require the court to apply the choice of law rules applicable to usury cases. Otherwise, a lender might escape Texas usury laws through the application of non-usury choice of law rules that give undue deference to a contractual choice of law provision
 
 
 [9]
 The integration clause read: This lease "constitutes the sole agreement of the parties with respect to the subject matter thereof." 586 S.W.2d at 478
 
 
 [10]
 The district court applied the Mississippi version of UCC § 1-201(37) which provides that a lease is conclusively a secured loan only if the purchase option requires the lessee to pay no additional, not just nominal consideration
 
 
 [11]
 The bankruptcy court relied in part on the fact that Woods-Tucker filed financing statements in Mississippi and Texas covering the lease to Hutcheson-Ingram to support its finding that the lease was in fact a secured loan. This reliance was improper in view of U.C.C. § 9-408 which provides that the filing of a financing statement "shall not of itself be a factor in determining whether or not the . . . lease is intended as security. (§ 1-201(37))." The financing statements filed stated that, "This lease is intended as security." Again, this cannot be considered in determining whether the lease was in fact a loan. See U.C.C. § 9-408 Comment 2 ("This section authorizes filing with appropriate changes of terminology, and without affecting the substantive question of classification of the lease.")
 
 
 [1]
 Thus, I agree with the majority that the sale-leaseback agreement is correctly characterized as a loan, that parol evidence is admissible to prove the option-to-repurchase (which, under the circumstances, conclusively established that security characterization), and that the loan is usurious. Whether Texas usury law applies (as the majority holds) or instead Mississippi usury law (as the district court held, in my view correctly), these holdings are correctly affirmed. (At the time of the transaction, both Texas and Mississippi provided for interest of ten percent per annum as the maximum legal rate, but Mississippi's usury penalties were less onerous than are those of Texas.)
 
 
 [2]
 Indeed, if it were no more than that, I should readily join my brothers in furthering the "strong policy of protecting Texas debtors" that the majority sees evidenced in the pre-UCC jurisprudence of that state. Prior to enactment of the UCC, Texas like most other American jurisdictions viewed with a jaundiced eye attempts by out-of-state money to earn interest beyond the legal rate allowable to borrowers in the forum state and, thus, to "evade" the state's usury laws. This view, however much it appeals to our Jacksonian economic sympathies, was deliberately repudiated by the UCC (enacted by forty-nine state legislatures) through its adoption of the hotly contested UCC § 1-105(1), discussed in Part II below of this dissent. See, e. g., Nordstrom and Ramerman, The Uniform Commercial Code and the Choice of Law, 1969 Duke L.J. 623 and Pounds, Party Autonomy Past and Present, 12 So.Tex.L.J. 214 (1970)
 
 
 [3]
 The majority found the applicable choice of law rule in the nineteenth century case of Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891). The majority mentions Texas UCC § 1.105(a) only in a footnote, and it is nowhere discussed in the text of the opinion
 In the footnote, the majority apparently relied on a statement in Hi-Fashion Wigs Profit Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App. Eastland 1979) to the effect that the Dugan rule was codified in Section 1.105(a). Id. at 302. I do not read that statement in Hi-Fashion as a judicial delimitation of the scope of Section 1.105(a); rather, the statement was merely to the effect that the UCC codification had adopted the Dugan rule that a party choice of the borrower's law as governing the transaction would be honored, when the borrower's jurisdiction bore a reasonable relationship to the transaction. It is not authority for any Texas interpretation that the party choice of the lender's law would not similarly be honored, if the transaction similarly bore a reasonable relation to the lender's jurisdiction. I find it significant that the Hi-Fashion court went on to resolve the issue before it in terms of the "reasonable relation" test of Section 1.105(a), and on applying that test it honored the party's choice of Oklahoma law as governing the transaction.
 In both Dugan and Hi-Fashion the non-usurious validity of the contract was upheld by the Texas courts by respecting the parties' reasonable choice of law a diametrically opposite result to the instant majority holding, where only by disregarding the parties' (reasonable, in my opinion) choice of law may the transaction be characterized as unenforceable under the forum law of the borrower.
 
 
 [4]
 Section 1.102 of the Texas enactment provides, identically to the UCC section:
 (a) This title shall be liberally construed and applied to promote its underlying purposes and policies.
 (b) Underlying purposes and policies of this title are:
 (1) to simplify, clarify and modernize the law governing commercial transactions;
 (2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
 (3) to make uniform the law among the various jurisdictions. * * *
 
 
 [5]
 The majority suggests, without so holding, that the choice of law provision here in question was contained in an adhesionary agreement. Neither of the courts below so held, and I do not address that issue except to note that the record does not indicate the courts below erred in this regard
 
 
 [6]
 The pre-UCC jurisprudence of Texas should not control the present inquiry, because the choice of law considerations in those cases do not take into account the express policies of national commercial uniformity that the legislature of that state subsequently adopted. See note 4, supra. In my view, Texas courts would now be mindful of the policies underlying the statutory choice of law rule embodied in the Texas UCC, and we should not presume otherwise and make an Erie guess that the Texas courts would decide contrary to the statutorily-adopted UCC policies
 
 
 [7]
 I should like to note that because I believe the majority has applied the wrong choice of law rule in this case I have restricted my dissent to a delineation of what I see as the appropriate application of the correct rule. I have not dwelt long on policy considerations, primarily because the majority's threshold error in identifying the incorrect choice of law rule led it to decide this case as if the UCC did not exist. Had it not erred in this regard, this case would be a more appropriate forum for weighing the policies embodied in the UCC against those underlying the Texas usury laws. Two points should be made, however
 The majority notes that the expectations of the parties to a multi-state transaction "really mean very little" when that transaction is usurious. To the extent that the only consideration involved is whether or not to allow party expectations to override a state's usury laws, I might agree. However, both traditional conflicts jurisprudence and UCC § 1-105(1) recognize that in some circumstances the expectations of the parties really mean quite a lot. Where a transaction is usurious in one interested jurisdiction but not in another, then party expectations have traditionally governed. E. g., Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927). This is precisely the circumstance that UCC § 1-105(1) is meant to address, and if the courts indeed take the position that party choice of law provisions are worth very little in usury cases, then a well-entrenched rule of law, embodied in Seeman and codified in UCC § 1-105(1), will be effectively read out of existence, along with our hope for commercial uniformity in this nation. We should not lightly allow this to occur.
 The majority also notes that the argument that its decision will make loans less available to Texas borrowers is an argument to the Texas legislature to amend its usury laws. With all due respect, a major point of this dissent is that the Texas legislature has already acted to alleviate this difficulty by adopting its version of the UCC.