LEASING SERVICE
CORPORATION, Plaintiff,

v.

SIMPKINS METAL BUILDINGS, INC.
and B.R. Simpkins and Jesse E.
Loveless, Defendants.

No. 83 Civ. 5751 (KTD).

United States District Court,
S.D. New York.

June 26, 1986.

Sol D. Bromberg, New York City, for plaintiff; Sol D. Bromberg, Louise S. Meller, of counsel.

Tenzer, Greenblatt, Fallon & Kaplan, New York City, for defendants; William M. Pinzler, Ronald L. Mayers, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Leasing Service Corporation ("LSC"), brings this breach of contract action against defendants, Simpkins Metal Buildings, Inc. ("SMB"), as lessee, and B.R. Simpkins, President of SMB, and Jesse E. Loveless, as guarantors, for the deficiency which exists following SMB's default under an equipment lease and the subsequent public sale of the repossessed equipment. Having considered the testimony and exhibits introduced at a one-day non-jury trial as well as, in accordance with the request of defense counsel, the papers previously submitted on plaintiff's summary judgment motion, I shall now set forth my findings of fact and conclusions of law.

## FACTS

On June 26, 1981, Frontier Crane & Machinery, Inc. ("Frontier") and SMB entered into an Equipment Lease Agreement (the "Lease") whereby Frontier agreed to lease a new truck crane with a lattice boom extension to SMB. Plaintiff's Exh. 1. SMB and Frontier also signed a Purchase Option Letter which essentially gave SMB the option to purchase the crane for $5,600 at the end of the lease provided SMB had at no time been in default. Plaintiff's Exh. 4. This same day, Frontier assigned the Lease to LSC. Plaintiff's Exh. 2. LSC is engaged in the business of, *inter alia*, leasing construction equipment either by directly leasing the equipment to a lessee or by acquiring pre-existing contracts in the form of chattel papers. Also on June 26, 1981, defendants Simpkins and Loveless executed a Guaranty of SMB's obligations to LSC. Plaintiff's Exh. 8.

Payments were made under the Lease through September 13, 1982. The payment made on September 13th was due on July 1, 1982. On September 10, 1982, LSC and SMB entered into the first of two extension agreements which changed the payment schedule of the original lease. Plaintiff's Exh. 5. Associated with this extension was an extension charge of $1,295 and an accrued late charge on the payments that were not made when due of $481. Plaintiff's Exh. 9. Three payments were made pursuant to this first extension agreement.

On January 1, 1983, a second extension agreement was entered into between the parties which again changed the payment schedule. Plaintiff's Exh. 6. Associated with this second extension was an extension charge of $6,306.64 and a delinquency charge of $304.25.[1] Plaintiff's Exh. 9. Also on January 1, 1983, a Purchase Option Letter was sent from SMB to LSC which changed the terms of the June 26, 1981 purchase option agreement between SMB and Frontier by changing the purchase price from $5,600.00 to $20,454.89. Plaintiff's Exh. 7.

On January 31, 1983, SMB paid $8,244 which apparently covered the extension and delinquency charges of the second extension as well as a portion of payments which had previously been due. The first payment under the second extension agreement, however, which was due April 1, 1983, was never made. Consequently, as the account was in default, the equipment was repossessed and, on May 25, 1983, sold at a public auction in Odessa, Texas. The auction was publicized in advance and all interested parties, including SMB, Frontier, Simpkins, and Loveless, were given written notice that the public sale was going to take place. Plaintiff's Exh. 10. At the auction, LSC purchased the equipment for $100,000. Plaintiff's Exh. 11.

Taking into account appropriate deductions for (1) closing out the transaction prior to its scheduled termination, Plaintiff's Exh. 13, and (2) the net auction proceeds, Plaintiff's Exh. 12, LSC calculated that a deficiency of $184,434.71 exists. In addition, in accordance with the terms of the Lease, LSC is seeking attorneys' fees in the amount of $36,886.94, which represents 20 percent of the deficiency.

---

1. Notably, each extension agreement contained the following paragraph:

   In order to induce you to agree to the foregoing extension, and in consideration of your so doing, the undersigned [SMB] warrants that the above indebtedness is a valid, binding and existing obligation of the undersigned, due and payable without any defense, counterclaim or offset whatsoever, and promises and agrees to pay said indebtedness to your order according to the terms set forth above, at your offices or such other place of payment you may designate, and in the event of a default in the payment of any installment or interest when due, the entire unpaid balance shall, at your option immediately become due and payable and you may enforce your rights and remedies under the Lien Instrument and/or Notes as if this extension had not been granted, and the undersigned grants you a security interest in all equipment, inventory, goods, machinery, fixtures, assets and property of any kind and nature now owned and hereafter acquired, to secure the payment, performance and fulfillment of all obligations of the undersigned to you whether now existing or hereafter incurred.

   Plaintiff's Exhs. 5 and 6.

## DISCUSSION

■ Preliminarily, I note that the portions of the Lease and Guaranty which (1) appointed an agent to accept service of process in New York on behalf of defendants, and (2) provided that venue and jurisdiction over any cause of action arising out of the contracts were properly laid in New York, are valid and enforceable. *See National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964). Thus the trial of the instant action before me in the Southern District of New York was proper.

Defendants advance three arguments in an effort to avoid liability or at least reduce the amount of damages. First, they claim that the Lease is unenforceable because it charges interest rates which are impermissably high. Second, they allege that the contract is unconscionable. Finally, they argue that, if LSC is entitled to any damages at all, they must be reduced by any proceeds LSC obtained from the crane after the auction. For the reasons set forth below, defendants' arguments are rejected as being without merit.

### I. *Impermissably High Interest Rates*

Defendants argue that the Equipment Lease Agreement is not a lease at all. Rather, defendants contend, it is either a secured loan or an installment sales contract and, accordingly, it charges interest rates which are impermissably high.[2]

■ In support of their argument that the transaction is not a lease but a secured loan, defendants cite only *Woods-Tucker Leasing Corp. of Georgia v. Hutcheson-Ingram Development Co.*, 626 F.2d 401 (5th Cir.1980). This case, however, is inapposite as it involved a sale-leaseback transaction. Specifically, defendant Hutcheson-Ingram Development Company ("Hutcheson-Ingram"), a real estate developer, needed money to complete an apartment project. It therefore approached Woods-Tucker Leasing Corporation of Georgia ("Woods-Tucker") for a loan. Woods-Tucker wanted collateral for the loan and Hutcheson-Ingram, which was also engaged in the business of citrus farming, offered some of the equipment it used in this business as collateral. Woods-Tucker then indicated that the transaction would have to be structured as a "sale-leaseback" wherein Woods-Tucker would purchase the equipment from Hutcheson-Ingram for $85,000 and then lease it back to Hutcheson-Ingram which had the option to buy back the equipment at the end of the lease for a nominal price. The Fifth Circuit found that this "sale-leaseback" transaction was in reality a secured loan and, accordingly, subject to the Texas usury laws. The transaction in *Woods-Tucker*, however, was very different from the transaction between LSC and SMB. Unlike the situation in *Woods-Tucker*, acquisition of a loan was not the reason for nor the end-product of the lease in the instant case. LSC never transferred any money to SMB. It would appear that, at best, the lease at issue in the present case is simply a type of credit sale and any argument that it is a secured loan is unsupported by the facts.

■ Defendants argue, in the alternative, that if the Lease is not considered a secured loan it should be viewed as an installment sales contract. Defendants then assert that an installment sales contract must have displayed on its face (1) the cash price; (2) the deferred payment price; and (3) the finance charge or "time-price differential."[3] *See International Harvester v. Rotello*, 580 S.W.2d 418, 421 (Tex. Civ.App.—Houston [1st Dist.] 1979). Because the Lease does not set forth on its face these three amounts, defendants contend that the finance charge cannot be

---

2. Under Texas law, in the absence of an agreement to the contrary, the maximum rate of interest parties may charge is 6·percent per annum. Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1967).

3. "'Time price differential,' ... means the amount which is paid ... for the privilege of purchasing goods ... to be paid for by the buyer in installments over a period of time." Tex.Rev.Civ.Stat.Ann. art. 5069–6.01(h) (Vernon 1979).

considered a "time-price differential" and must instead be deemed "interest" which, because it exceeds the legal rate of interest, is usurious.

The definition of "interest" in the Texas Usury Statute is as follows:

"Interest" is the compensation allowed by law for the use or forbearance or detention of money; provided however, this term shall not include any time price differential however denominated arising out of a credit sale.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.01(a) (Vernon 1967). Assuming that the Lease was in fact an installment sales contract or credit sale, the mere fact that it did not specifically set forth the cash price, the deferred payment price, and the time-price differential should not alone preclude the time-price differential exclusion under the Texas usury law from applying to this case. Indeed, it would appear to be quite unjust to permit a party who voluntarily and knowingly agreed to enter into a transaction in one form (i.e. a lease) to later argue that (1) the reality of the transaction was something different, and (2) because of (1), the form actually used did not conform to the usual requirements of such a transaction. Acceptance of such an argument is especially unfair where, as here, it is not contested that the information defendants contend should have been provided on the face of the contract was easily discernable.

As previously noted, the transaction between LSC and SMB is, at best, a credit sale. The Texas Usury Statute plainly states that "[interest] shall not include any time price differential *however denominated* arising out of a credit sale." Tex.Rev.Civ.Stat.Ann. art. 5069–1.01(a) (Vernon 1967) (emphasis added). Contrary to defendants' assertion, the fact that the time-price differential for the instant sale was not specifically stated in the contract should not be controlling. If the reality of the transaction between LSC and SMB is to

be examined and a conclusion reached that the parties actually entered into a credit sale rather than a lease, then it is only appropriate also to look beyond the language used by the parties in the contract to determine whether what SMB was paying was "interest" or a "time-price differential." I find that, if anything, SMB was merely paying a time-price differential. As the court stated in *Rattan v. Commercial Credit Co.*, 131 S.W.2d 399 (Tex.Civ.App.— Dallas, 1939, writ ref'd), a case upon which defendants rely, "No money changed hands in the transaction in the form of a loan, nor was any charge made for the use, detention or forbearance of any money. The transaction was simply a sale for credit at a higher price than for cash...." In short, defendants' attempt to look at the reality of the transaction in the first instance and then to use that reality to ask the court to exalt form over substance in the second instance, cannot be countenanced.[4]

## II. *Substantive Unconscionability*

Essentially, defendants contend that the Lease is unconscionable and thus unenforceable because of the unequal bargaining power of the parties and the defendants' ignorance of the provisions in the Lease regarding attorneys' fees, liquidated damages, and the consequences of default. Mr. Simpkins, however, freely admitted at trial that the reason he was unaware of any of the Lease provisions, or for that matter anything contained in the option to purchase or the Guaranty, was that he did not "read any of the documents that were offered to [him]." Tr. 44. Defendants complain that they were inexperienced and unsophisticated and that plaintiff and its agents abused their bargaining power apparently by, *inter alia*, (1) not suggesting to Mr. Simpkins that he should read the documents he was signing, (2) not offering to read the documents to him, and (3) not explaining the documents to him.

---

**4.** It should be noted that, even if the Lease were either a usurious secured loan or a usurious installment sales contract, Mr. Simpkins and Mr. Loveless, as individual guarantors, would apparently not be able to assert the defense of usury. *See Universal Metals & Machinery, Inc. v. Bohart*, 539 S.W.2d 874, 879 (Tex.1976).

I am simply unpersuaded by defendants' argument that Mr. Simpkins was an inexperienced businessman of whom unfair advantage was taken. First, after listening to Mr. Simpkins testify at trial, I am convinced that he is an intelligent man easily capable of understanding the contents of the Lease if he chose to read it. Second, he impressed me as an enterprising individual who has, as a result of hard work, achieved at least a moderate degree of success in the business world; he did not appear to be the sort of individual who could be steamrolled into entering a contract. Third, Mr. Simpkins' resume belies any claim of business naïveté. Mr. Simpkins testified at trial that he owns all or part of a number of businesses, including: (1) an oil service business called HSAD Services in Wyoming; (2) a convenience store in Texas; (3) Odessa Crane Service in Texas; (4) SMB in Texas; and (5) Kangaroo, Inc., a caramel corn business in Texas. In sum, mere ignorance of the terms of a lease is not grounds for finding the lease to be unconscionable especially when that ignorance is the party's own fault and no meritorious argument has been made for finding the terms of the lease unreasonable.

Defendants also argue that they believed they were only obligated to keep the crane for the first year of the Lease. Mr. Simpkins testified that in 1981 he and Loveless decided to go into the crane business. To this purpose, they contacted Doyce Watson, a friend of Loveless who was a salesman at Frontier. Mr. Simpkins testified that at either the first or second meeting, Watson stated that SMB had to keep the crane for one year. Simpkins stated that he understood from this representation that after one year the crane could be returned to Frontier. Tr. 38. He admitted, however, that he probably discussed the terms of the Lease only once with Watson, Tr. 38, that Watson was an employee of Frontier, and that he did not have such a conversation with anybody at the time he signed the Lease. Tr. 50. Mr. Simpkins also conceded that Pat Miller, the only person from LSC with whom he met, never said that SMB could return the crane after one year. Tr. 51.

Defendants' reliance on an alleged oral representation that the crane only had to be kept for one year is especially untenable given Simpkins' failure ever to attempt to verify his understanding of his obligations and his refusal to read the Lease which quite clearly contradicted the alleged representation. At its outset the Lease provided in unambiguous terms the following:

> Lessee ... acknowledges that no warranties, representations or agreements not expressed herein have been made by Lessor .... Lessee ... agrees and promises to pay to the order of ... Leasing Service Corporation ... said Balance of Rent [$386,400.00], plus any applicable sales tax, in successive monthly installments ... until paid ....

Plaintiff's Exh. 1. In short, defendants' argument that the Lease is unenforceable due to unconscionability is thoroughly unsupported by the facts and thus must be rejected.

### III. *Mitigation*

■ Defendants' final argument is that, if they are found to be liable under the Lease, they should not be held to the full amount of damages claimed by plaintiff because plaintiff failed to mitigate fully its damages. It should be noted that defendants' attorney conceded at trial that the defendants "are not here challenging whether [plaintiff] complied with the UCC with respect to the commercial reasonableness of the sale but only that whatever income [plaintiff] subsequently received from further use of that sale, should be used to reduce this defendant's credit balance."[5] Tr. 28.

---

**5.** U.C.C. § 9–504(3) provides that "every aspect of the disposition [of the collateral] including the method, manner, time, place and *terms* must be commercially reasonable." Tex.Bus. & Com.Code Ann. § 9.504(c) (1977) (emphasis added). Thus, by not challenging the commercial reasonableness of the public sale, defendants have implicitly admitted that the $100,000 plaintiff paid for the crane was a commercially reasonable price.

At trial, defendants sought to introduce information regarding the amount of money LSC received from its use of the crane subsequent to LSC's purchase of it at the public sale. I did not permit testimony on this subject, however, as the completion of the public sale logically ended any interest defendants had in the collateral. Defendants provide no legal support for their argument that events after the sale should be considered in reducing defendants' obligation. Indeed, such consideration would generally, *inter alia,* reduce the court's ability to determine with finality a defendant's obligation. Moreover, U.C.C. § 9–504(4) provides that when a secured party disposes of collateral at, for example, a commercially reasonable public sale, "the disposition transfers to a purchaser for value all of the debtor's rights therein ...." Tex.Bus. & Com. Code Ann. § 9.504(d) (1977). Defendants provide absolutely no basis for distinguishing between a purchaser for value who was not involved in the original transaction and a purchaser for value who also happens to be the secured party. Notably the statute even expressly contemplates that the purchaser for value may be the secured party. Tex.Bus. & Com. Code Ann. § 9.504(c) (1977) ("The secured party may buy at any public sale ...."). As defendants have provided absolutely no legal support for their request that any proceeds LSC acquired from use of the crane after the commercially reasonable public sale be applied to reduce their obligation to LSC, and because no justifiable reason for so doing is apparent, defendants' request is denied.

Accordingly, I find defendants are liable to plaintiff for (1) the $184,434.71 deficiency, and (2) as attorneys' fees, $36,886.94 (i.e. 20 percent of the deficiency) or plaintiff's actual attorneys' fees, whichever is less. Plaintiff is directed to submit a judgment within ten (10) days of the filing of this decision on five (5) days' notice.

SO ORDERED.