**LEASING SERVICE CORPORATION, Plaintiff,**

v.

**David GRAHAM, Defendant.**

**No. 84 CIV. 1916 (PKL).**

United States District Court, S.D. New York.

Oct. 22, 1986.

Sol D. Bromberg, New York City, for plaintiff.

Pollner, Mezan, Stolzberg & Frechtman, P.C., New York City (William M. Pinzler, of counsel), for defendant.

LEISURE, District Judge:

This action for breach of contract is brought by Leasing Service Corporation ("LSC"), a New York corporation, against David Graham ("Graham"), a citizen of the State of Texas. Subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. LSC has moved for summary judgment to uphold a deficiency of $524,995.43 arising from Graham's alleged default under the terms of three lease agreements.

In response to plaintiff's motion, Graham attacks particular lease provisions as unconscionable, and argues that the leases violate Texas usury statutes. In addition, Graham raises sixteen affirmative defenses; he also contends that venue would more appropriately lie in Texas, where the defendant resides and where the lease agreements were executed.

Since a genuine issue of material fact exists with respect to the computation of damages, this action is not appropriate for summary judgment. *See* Fed.R.Civ.P. 56(c). It can, however, be partially adjudicated, particularly with respect to liability, pursuant to Fed.R.Civ.P. 56(c) and (d).

## FACTUAL BACKGROUND

Graham is the sole proprietor of a crane business, doing business as Pyramid Crane Service. Graham executed three separate crane lease agreements with three Texas equipment companies on April 2, 1980, September 30, 1980, and January 22, 1982. Each was signed directly under the title DAVID GRAHAM DBA PYRAMID CRANE SERVICE.

Shortly after each lease was executed, it was assigned to LSC. Each lease was a standardized LSC "EQUIPMENT LEASE AGREEMENT". Each lease contained the phrase: "Lessee further acknowledges notice of the intended assignment of this lease to either Credit Alliance Corporation or Leasing Service Corporation." Thus, Graham had notice of the proposed assignment to LSC at the time he signed the leases.

All three leases were negotiated through an LSC representative, Pat Miller. In each lease the words "No purchase option available hereunder, no renewal option available hereunder" appeared clearly typed, not printed, in the upper right hand portion of the front side of the contract, directly under the line entitled "BALANCE OF RENT." Despite this clear designation, and the fact that the rental payments due under the three contracts were to total over $1 million, defendant claims that he

did not read any of the contracts, each of which consisted of densely spaced writing on both sides of one page. Graham contends that Pat Miller misrepresented to him the leases as purchase agreements.

On October 23, 1980, Graham did obtain purchase options for the two cranes he was leasing at that time; he later signed a purchase option for the third crane. The purchase price specified in each purchase option was one month's additional rent, a total of $15,224.75 for all three cranes. Each purchase option was to become effective at the end of the lease term, provided that there had been no default thereunder.

On June 13, 1983, defendant, who was experiencing financial difficulty, signed identical extension agreements on two of the lease agreements. These read in part:

> In order to induce you to agree to the foregoing extension, and in consideration of your so doing, the undersigned warrants that the above indebtedness is a valid, binding and existing obligation of the undersigned [Graham], due and payable without any defense, counterclaim or offset whatsoever, and promises and agrees to pay said indebtedness to your order according to the terms set forth above ... and in the event of a default in the payment of any installment or interest when due, the entire unpaid balance shall, at your option immediately become due and payable and you may enforce your rights and remedies under the Lien Instrument and/or Notes as if this extension had not been granted.

Graham defaulted sucessively on the three agreements on September 15, September 22, and October 1, 1983, respectively. LSC repossessed the cranes and scheduled a public sale for December 6, 1983. Graham was notified according to the terms of the lease agreements. The sale was advertised in three publications, one of which, The Contractors Hot Line, has over 50,000 subscribers.

LSC, the only bidder at the sale, alleges that it bid $180,000 for the three cranes.

Graham, who was also present, alleges that LSC bid $200,000. If Graham is correct, then LSC's deficiency calculation is necessarily overstated by at least $20,000.

## DISCUSSION

As a threshold matter, the Court notes that a genuine dispute of fact regarding plaintiff's computation of damages precludes summary judgment on that issue. Fed.R.Civ.P. 56(c). Nonetheless, "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." *Id.* When there is a controversy as to damages, but not as to liability, the procedure to be followed is that specified in Fed.R.Civ.P. 56(d). 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2736, at 447 (1983).

Fed.R.Civ.P. 56(d) states that:

[i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court.... shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy ....

Because this order is a pre-trial adjudication rather than a final order, "the trial court retains jurisdiction to modify the order at any time prior to the entry of a final judgment." 10A C. Wright, *supra,* § 2737 at 463–4; *see Dyal v. Union Bag–Camp Paper Corp.*, 263 F.2d 387, 395 (5th Cir. 1959). The right of either party to a jury trial on those issues that remain in dispute will not be affected. *See* 10A C. Wright, *supra,* § 2736 at 452.[1]

The District Court is empowered to specify in the pre-trial order any amount of damages which is not in controversy. 10A C. Wright, *supra,* § 2737, at 454–5; *see Sloane v. Land*, 16 F.R.D. 242 (S.D.N.Y. 1954); *McDonald v. Batopilas Mining Co.*, 8 F.R.D. 226 (E.D.N.Y.1948). The court

---

1. Although LSC did not demand a jury trial, Graham's answer contains such a demand.

may also grant partial summary judgment on an affirmative defense that poses no genuine issue of fact. *See First National City Bank v. Kline,* 439 F.Supp. 726, 728 (S.D.N.Y.1977); *see* 10A C. Wright, *supra,* § 2737 at 462.

### A. *Forum-Selection Clauses*

■ Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972) (footnote omitted); *see also AVC Nederland B.V. v. Atrium Investment Partnership,* 740 F.2d 148, 156 (2d Cir.1984). "[A]bsent a showing that defendant would be deprived of [his] day in court if the forum clause is enforced, the clause will not be deemed 'unreasonable or unjust.'" *Credit Alliance Corp. v. National Crane Rental,* No. 83 Civ. 7752, slip op. at 1 (S.D.N.Y. May 17, 1984) [available on WESTLAW, DCTU database], *adhered to,* No. 83 Civ. 7752 (S.D.N.Y. Sept 17, 1984) [available on WESTLAW, DCTU database] (citation omitted).

■ In this action, the leases specify that jurisdiction and venue will lie in New York. The leases also name a New York agent to accept service of process on behalf of the defendant. Identical provisions have been upheld in this district on numerous occasions. *See, e.g., Leasing Service Corp. v. Energy Construction Co.,* No. 80 Civ. 2653, slip op. at 2–3 (S.D.N.Y. Dec. 3, 1980) [Available on WESTLAW, DCTU database] (citations omitted). Indeed, it is well-settled that "parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964). It is also clear that a contract clause providing for service of process on a designated New York agent will be held valid in the Second Circuit. *Credit Alliance Corp. v. Cassady,* No. 80 Civ. 3280, slip op. at 1 (S.D.N.Y. Jan. 13, 1981) (cita-

tions omitted). Graham, therefore, has submitted to personal jurisdiction in New York.

■ Graham's failure to read these commercial contracts, obligating him to pay over $1 million, or seek counsel to interpret these contracts, cannot be viewed as fraud or overreaching on the part of LSC. *National Crane Rental,* No. 83 Civ. 7752, slip op. at 1 (S.D.N.Y. Sept. 17 1984). Graham, a businessman acting in a commercial context, is held to have understood the consequences of his having signed the lease agreements and extensions, which designate New York as the appropriate forum for any action arising thereunder. If Graham did not read them or hire counsel to do so, he is the victim of his own lack of diligence, not plaintiff's misconduct. *See Credit Alliance Corp. v. B & P Excavating, Inc.,* No. 80 Civ. 2649, slip op. at 4–6 (S.D.N.Y. Feb. 27, 1981).

New York is not an "unjust" forum in this case. Graham offers no evidence that he would be unable to defend this action in New York; he merely asserts that it would be inconvenient for him to do so. Such an allegation is insufficient to invalidate the contracts' forum selection clauses.

### B. *Transfer of Venue*

■ Graham also argues that this court should grant a transfer of venue for the convenience of the parties pursuant to 28 U.S.C. § 1404(a). As previously discussed, each of the signed leases contains an enforceable forum-selection clause. A party who signs an agreement containing venue and jurisdiction selection clauses may be deemed to have waived his right to assert his own convenience as a factor favoring a transfer to another forum under Section 1404(a). *Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 758, n. 7 (3d Cir.1973); *see Energy Construction Co.,* No. 80 Civ. 2653, slip op. at 6 (S.D.N.Y. Dec. 3, 1980). Moreover, as Judge Gagliardi of this Court has observed:

[P]olicy considerations favor enforcement of venue selection clauses in credit sales agreements unless extenuating circumstances dictate otherwise. The avail-

ability of credit for small businesses may depend on the expectations of finance companies that the contracts will be enforced according to their terms, and that in the event of nonpayment, litigation will not be required in forums throughout the country wherever defendants may reside.

*Cassady,* No. 80 Civ. 3280, slip op. at 5, n. 1 (S.D.N.Y. Jan. 13, 1981).

Graham has offered no evidence that he would be deprived of his day in court if the forum clause is enforced; nor is there any evidentiary showing that the cost of litigating in New York would be appreciably greater than in Texas. Therefore, the request for a transfer of venue is denied.

### C. *Fraudulent Inducement and Misrepresentation*

Although Graham asserts that the lease agreements were misrepresented to him as sales agreements, this defense does not withstand scrutiny.[2] The Second Circuit has recently discussed the proper standard for considering a claim of fraudulent inducement in a breach of contract case under New York law. *Sheffield Commercial Corp. v. Clemente,* 792 F.2d 282 (2d Cir.1986). In *Sheffield,* where an auto dealership sued to recover a deficiency

judgment following the repossession and sale of a leased car, the Court noted:

Clemente's claim of fraudulent inducement requires little discussion. Even if Sheffield's agent described the transaction as a sale, and it is far from clear that he did, no fraud is claimed with respect to the contract payment provisions, or disclaimers of warranties. Whether characterized as a "sale" or a "lease", no misrepresentations are alleged regarding the obligations imposed or rights created by the contract.

It is well settled that a party seeking recision of a contract on the ground that it was fraudulently induced must demonstrate that the alleged misrepresentation was "material" in that it influenced the party's decision to enter into the contract.

*Id.* at 285 (citations omitted). In this case, Graham has made no showing that a material misrepresentation induced him to enter into the lease agreements[3]. Moreover, any misconceptions he may have entertained pertaining to whether the lease agreements were actually sales contracts were certainly cured when he obtained purchase options on all three cranes.

### D. *Usury*

Graham contends that the lease contracts are usurious under Texas law.[4] Graham

---

**2.** This Court is generally unwilling to conclude that a businessman should not be held responsible for having read and understood simple contractual language. In the absence of fraud or any wrongful act committed by the other party, the person signing a written contract will be held to have understood and assented to its terms. *Gaskin v. Stumm Handel GmbH,* 390 F.Supp. 361, 366 (S.D.N.Y.1975) (quoting *Metzger v. Aetna Ins. Co.,* 227 N.Y. 411, 416, 125 N.E. 814, 816 (1920)).

**3.** Although Texas law would appear to apply, see discussion *infra* at —— n. 4, the parties in their submissions to the Court, have in no manner indicated that any conflict exists between Texas and New York law in the areas of fraud and misrepresentation. Under these circumstances the Court does not feel obligated to undertake an investigation to determine whether there is any difference in the Texas law and what law a Texas court would apply if there were. *See Lehman v. Dow Jones & Co.,* 783 F.2d 285, 294 (2d Cir.1986).

**4.** As a preliminary matter, all parties agree that Texas law governs this action. In a diversity action, the choice of law rules to be applied are those of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); New York choice of law rules specifies that "either the intent of the parties determines the law to be applied, or the law of the state with the most significant contacts with the matter in dispute governs." *Leasing Service Corp. v. Diamond Timber, Inc.,* 559 F.Supp. 972, 975 (S.D.N.Y.), *aff'd,* 729 F.2d 1442 (2d Cir.1983) (citations omitted).

Texas and New York usury laws conflict. Although the defense of usury is unavailable to corporate defendants in New York, N.Y. Gen. Oblig. Law § 5–521 (McKinney 1978), Texas usury statutes apply to both individual and corporate borrowers. *See Transamerican Leasing Co. v. Three Bears, Inc.,* 586 S.W.2d 472, 477 (Tex.1979).

LSC's lease agreements would allow for either Texas law or New York law to apply. There-

argues that his lease agreements are properly characterized as either secured loans or installment sales contracts. As such, he further argues that the parties to the lease agreements failed to specify a rate of interest to be charged, thus subjecting the agreements to the six percent annual interest limitation on loans established by statute in Texas. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon Supp. 1986). In support of this argument, Graham cites the Texas Business and Commerce Code, which states that an agreement constitutes a "security interest" if it conveys:

> an interest in personal property or fixtures *which secures payment or performance of an obligation....* [A]n agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for ... nominal consideration does make the lease one intended for security.

Tex.Bus. & Com.Code Ann. § 1.201(37) (Vernon Supp. 1986) (emphasis supplied).

Graham contends that the lease agreements he signed are secured loans under this statute and that, as such, they violate Texas usury laws. Even if the Court were to accept Graham's dubious premise—that if this lease is a "security interest" it is therefore, a loan—Graham's assertion that the lease agreements were security interests under Texas law is itself incorrect.

▮ First, each purchase agreement states that the "Equipment Lease Agreement between [the parties] shall be amended and supplemented, effective sixty (60) days prior to the expiration of the initial term therof and provided said Lease then is not and has not been in default." According to their terms, the purchase options did not go into effect. Second, even if they had become effective, the lease agreements

were never interests in personal property that secured the payment of an obligation. When no money changes hands in the transaction in the form of a loan, nor is any charge made for the use, detention or forbearance of any money, a contract cannot properly be denominated a "security interest." *See Rattan v. Commercial Credit Co.*, 131 S.W.2d 399 (Tex.Civ.App.1939)[5].

▮ Graham argues, in the alternative, that if the leases cannot be considered security interests, they should alternatively be viewed as installment sales contracts. As support for this position, Graham cites *International Harvester Co. v. Rotello*, 580 S.W.2d 418, 421 (Tex.Civ.App.1979), which states that:

> [I]f the retail installment contract shows on its face that there is a cash price and a deferred payment price which are revealed to the purchaser at the time of the making of the contract, and that the finance charges are set forth as such, the amount of such finance charges will not be deemed interest, but a time-price differential paid for [sic] privilege of purchasing goods or services to be paid for by the buyer in installments over a period of time.

Graham contends that because the LSC leases, on their face, do not break out the finance charges, all these charges should be deemed "interest," thus making the contracts usurious. Texas' definition of "interest," however, belies Graham's interpretation. Texas law defines interest as "the compensation allowed by law for the use or forbearance or detention of money; provided however, *this term shall not include any time price differential however denominated arising out of a credit sale.*" Tex.Rev.Civ.Stat.Ann. art. 5069–1.01(a) (Vernon 1971) (emphasis supplied).

fore, either Texas or New York law would be in accordance with the presumed intent of the parties. Applying the "most significant contacts test," however, it is clear that Texas law is more appropriate. The contracts in question were negotiated and signed in Texas and the equipment was used, repossessed and sold in Texas.

**5.** The case upon which Graham relies, *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 642 F.2d 744 (5th Cir.1981), involves a sale-leaseback arrangement and is therefore easily distinguishable from the leasing arrangement here in question. *Leasing Service Corp. v. Simpkins Metal Buildings, Inc.*, 638 F.Supp. 896 (S.D.N.Y.1986) (Duffy, J.).

In a recent case in this District, Judge Duffy rejected the argument that LSC documents, identical to the documents in this case, represented usurious credit sales contracts under Texas law. The Court noted that:

> [T]he fact that the time-price differential for the instant sale was not specifically stated in the contract should not be controlling. If the reality of the transaction between LSC and [defendant] is to be examined and a conclusion reached that the parties actually entered into a credit sale rather than a lease, then it is only appropriate also to look beyond the language used by the parties in the contract to determine whether what [defendant] was paying was "interest" or a "time-price differential." ... In short, defendants' attempt to look at the reality of the transaction in the first instance and then to use that reality to ask the court to exalt form over substance in the second instance, cannot be countenanced.

*Leasing Service Corp. v. Simpkins Metal Buildings, Inc.,* 638 F.Supp. 896, 899 (S.D.N.Y.1986) (Duffy, J.) (footnote omitted).

■ This Court fully concurs with Judge Duffy's reasoning. If Graham's agreements with LSC constitute credit sales rather than leases, then those sales are not usurious. It would certainly be unjust to allow this businessman who "voluntarily and knowingly agreed to enter into a transaction in one form (i.e. a lease) to later argue that (1) the reality of the transaction was something different, and (2) because of (1), the form actually used did not conform to the usual requirements of such a transaction." *Id.* at 899.

E. *Unconscionability*

■ Graham's contention that LSC's lease agreements are unconscionable can be dealt with briefly. In making such a determination, this Court must look at the

atmosphere in which the agreement was executed. It must consider whether the bargaining power of one party was grossly disproportionate to that of the other, what alternatives were available to the allegedly oppressed party, "whether the contract is illegal or against public policy, and, whether the contract is oppressive or unreasonable." *Wade v. Austin,* 524 S.W.2d 79, 86 (Tex.Civ.App.1975). However, "a party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts." *Id.* "[I]t is the exceptional commercial setting where a claim of unconscionability will be allowed, absent undiscoverable 'latent defects'." *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. 1300, 1308 (S.D.N.Y.1970), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971) (interpreting U.C.C. § 2-719, adopted in Texas as Tex.Bus. & Com.Code Ann. § 2.719 (Vernon 1968)).

■ In this action, all three leases were executed in a commercial environment; the proprietor of a crane business negotiating lease agreements entailing over $1 million in payments is generally not without bargaining power in such negotiations. Defendant offers no convincing evidence here of any unfair pressure or other material latent defect[6].

Finally, the contracts themselves are not "so one-sided as to be unreasonable." *Wade,* 524 S.W.2d at 86. Identical lease agreements have frequently been upheld as valid in this district. *Simpkins Metal Buildings, Inc.,* 638 F.Supp. 896, 900 (S.D.N.Y.1986); *see Leasing Service Corp. v. Justice,* 673 F.2d 70, 74 (2d Cir.1982).

F. *Damages*

Graham contends that LSC failed to mitigate damages. Significantly, he does not claim that the sale of the cranes was not

---

6. In the case upon which defendant relies, Judge Duffy found a material question of fact existed on the issue of unconscionability because of serious allegations by defendant of pressure. *Leasing Service Corp. v. Simpkins Metal Buildings, Inc.,* No. 83 Civ. 5751 (S.D.N.Y. Oct. 30, 1984) [available on WESTLAW, DCTU database] (memorandum and order denying motion by plaintiff for summary judgement). After a one day non-jury trial, judgment was awarded to plaintiff LSC. *Simpkins Metal Buildings, Inc.,* 638 F.Supp. 896 (S.D.N.Y.1986).

"commercially reasonable" or that it violated the section of the Texas Business and Commerce Code which governs a secured party's right to dispose of collateral after default. *See* Tex.Bus. & Com.Code Ann. § 9.504 (Vernon Supp.1986). Rather, Graham contends that LSC resold the cranes after the auction and that he should be credited with the resale value.

Texas law clearly states that "[w]hen collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein...." Tex.Bus. & Com.Code Ann § 9.504(d) (Vernon Supp. 1986). As long as the sale is "commercially reasonable", "[t]he secured party may buy at any public sale...." Tex.Bus. & Com.Code Ann. § 9.504(c) (Vernon Supp. 1986). Thus, the completion of the public sale ended any interest Graham had in the cranes. *Simpkins Metal Buildings, Inc.*, 638 F.Supp. 896, 900 (S.D.N.Y.1986).

In this case, a public sale was held after proper notice was given by way of advertising in three publications. Graham claims that a potential bidder arrived after the sale had ended who would have outbid LSC. Graham's interest in the cranes, however, ended with the sale. "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Tex. Bus. & Com.Code Ann. § 9.507(b) (Vernon Supp.1986).

In computing defendant's deficiency, LSC deducts 15% of the total rent due under the leases as liquidated damages as provided for in the lease agreements. Courts routinely uphold such liquidated damage provisions unless such provisions are illegal or against public policy. *Shasteen v. Mid-Continent Refrigerator Co.*, 517 S.W.2d 437, 440 (Tex.Civ.App.1974) (ci-

tation omitted); *see Justice*, 673 F.2d at 73. These provisions are particularly useful in situations where actual damages may be difficult to estimate, so long as the amounts fixed are not plainly or grossly disproportionate to any probable loss. 673 F.2d at 73. The Second Circuit has specifically noted that

> [i]n addition to the contractual right to the receipt of rental payments, the lessor or assignee had a right, at the termination of the lease agreement, to return of the leased equipment or compensation for the failure to return the equipment. The contract's terms governing the liquidation of damages in the event of default provided for a public sale of the leased equipment. Such sale, clearly, would require the lessor to relinquish this reversionary interest. The value of the lessor's interest in the equipment at the termination of the lease would depend upon the physical condition of the equipment and the market conditions at that time. Since this value is incapable of precise estimation ... the provisions of the lease agreement are not unconscionable as a matter of law.

*Id.* at 74.

LSC also deducts 20% of the total rent due under the leases as an estimation of attorney's fees. The contracts provide that attorney's fees "are hereby agreed to be no less than 20% of any amount sought." Identical contractual provisions have been upheld by this court. *B & P Excavating, Inc.*, No. 80 Civ. 2649, slip op. at 7 (S.D.N.Y. Feb. 27, 1981). Such provisions, freely consented to, are not unreasonable. *Id.*[7]

The only issue with respect to damages, and with respect to the litigation as a whole, upon which there is a genuine dispute of fact, is the total amount bid by plaintiff for the cranes at auction. Defendant alleges that plaintiff bid $200,000; plaintiff claims it bid $180,000. This disputed figure is obviously material because

---

7. Moreover, in moving for summary judgment LSC has agreed that in the event that actual attorney's fees are less than 20%, Graham should be charged the lesser amount. Plaintiff's Memorandum In Support Of Motion For Summary Judgment at 4.

it effects the final total of the deficiency owned by plaintiff.

## CONCLUSION

Pursuant to Fed.R.Civ.P. 56(c), this Court finds that LSC is entitled to summary judgment on the issue of Graham's liability. There are no genuine issues of material fact existing with respect to the right of LSC to enforce the lease provisions here in question against Graham. And upon these undisputed facts, LSC is entitled to judgment, as a matter of law, with respect to defendant's liability.

Because a genuine issue of material fact exists with respect to a portion of plaintiff's damages claim, *see* discussion *supra* at 1414, plaintiff's motion for a final order of summary judgment must be denied at this time. Nonetheless, based upon an examination of the pleadings and the other evidence presented on the motion for summary judgment, it is entirely appropriate for this Court to enter an order specifying those facts that appear "without substantial controversy." Fed.R.Civ.P. 56(d). Such an order may include "the extent to which the amount of damages or other relief is not in controversy." *Id.*

Upon this Court's finding that the agreements between LSC and Graham are not unconscionable, fraudulent, or oppressive, as a matter of law, it is established that LSC's method of computing Graham's deficiency is valid. All that remains in dispute is whether the auction figure of $180,000 or $200,000 should be used in computing the final figure owed by defendant. Judgment will not be entered in this case until this final dispute has been settled by the parties or otherwise adjudicated.

SO ORDERED.